Sharron STEWART, Houston Audubon
Society, and Sierra Club

v.

Eric R. POTTS, District Engineer; U.S.
Army Corps of Engineers, Galveston
District; Togo D. West, Jr., Secretary of
the Department of the Army; the City of
Lake Jackson; and James Martin, May-
or.

No. CIV. A. G–96–282.

United States District Court,
S.D. Texas,
Galveston Division.

March 6, 1998.

James B. Blackburn, Jr., Blackburn & Carter, Richard Roberts Morrison, IV, Blackburn and Carter, Houston, TX, for plaintiffs.

Lois J. Schiffer, DOJ, Environment and Natural Resources Div., Eileen T. McDonough, DOJ, Environmental Defense Section, Donna Fitzgerald, DOJ, General Litigation Section, Washington, DC, Mellie M. Billingsley, U.S. Army Corps of Engineers, General Counsel, Galveston, TX, Daniel M. Flores, DOJ, Environmental Defense Section, Washington, DC, Barry Abrams, Abrams Scott and Bickley, Houston, for defendants.

### ORDER

KENT, District Judge.

Plaintiffs Sharron Stewart, Houston Audubon Society, and Sierra Club bring this action against the United States Army Corps of Engineers (the "Corps"), Colonel Eric R. Potts in his official capacity as District Engi-

neer of the Corps,[1] and Togo D. West in his official capacity as Secretary of the Department of the Army (collectively, the "Federal Defendants").[2] Plaintiffs seek injunctive and other relief pursuant to the Administrative Procedure Act, 5 U.S.C. §§ 701–706, the Clean Water Act, 33 U.S.C. § 1251 *et seq.*, and the Declaratory Judgment Act, 28 U.S.C. § 2201, for violations of the National Environmental Policy Act, 42 U.S.C. §§ 4321 *et seq.*, and the Clean Water Act.[3] Now before the Court are the Federal Defendants' Motion for Summary Judgment and the Plaintiffs' Motion for Summary Judgment, both filed on December 29, 1997. For the reasons stated below, both Motions for Summary Judgment are **GRANTED IN PART** and **DENIED IN PART.**

## I. STATUTORY FRAMEWORK

### A. *The Section 404 Permit Program*

The Clean Water Act ("CWA") is a comprehensive statute, designed "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). Consistent with that goal, the CWA prohibits the discharge into navigable waters of any pollutant, including dredged or fill material, unless authorized by a CWA permit. 33 U.S.C. § 1311(a). CWA section 404, 33 U.S.C. § 1344, is the provision which regulates the Corps' issuance of such permits. "Navigable waters" is defined broadly to include all "waters of the United States, including the territorial seas." 33 U.S.C. § 1362(7). "Waters of the United States" are defined to include "wetlands adjacent to [such] waters." 40 C.F.R. § 230.3(s)(7). Wetlands, in turn, are defined as "areas that are inundated or saturated by surface or groundwater at a frequency and duration sufficient to support, and that under normal circumstances do support, a preva-

1. Plaintiffs originally named Robert Gatlin as Defendant in his official capacity as District Engineer for the Galveston District of the Corps. Gatlin has been replaced as District Engineer by Colonel Eric Potts. Pursuant to Fed. R. Civ. P. 25(d)(1), Potts is automatically substituted for Gatlin as a Defendant.

2. Claims against the City of Lake Jackson and James Martin in his official capacity as Mayor of

Lake Jackson were dismissed with prejudice by Order of the Court entered October 30, 1997.

3. The Plaintiffs' claims arising under the citizen suit provision of the CWA, section 505(a)(1), 33 U.S.C. § 1365(a)(1), and the federal mandamus provision, 28 U.S.C. § 1361, were dismissed with prejudice by Order of the Court entered October 30, 1997.

lence of vegetation typically adapted for life in saturated soil conditions." 33 C.F.R. § 328.3(b).

The Corps issues "jurisdictional determinations" in determining whether a proposed activity will result in a discharge into a wetland or other water of the United States, thus requiring a section 404 permit. These findings determine "the applicability of the [CWA] ... to activities or tracts of land and the applicability of general permits or statutory exemptions to proposed activities." 33 C.F.R. § 320.1(a)(6).

**B.** *The National Environmental Policy Act*

 The National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321–4347, requires federal agencies to prepare an environmental impact statement ("EIS") to be included in every major Federal action that significantly affects the quality of the human environment. 42 U.S.C. § 4332(2)(C). The issuance of a section 404 permit by the Corps of Engineers is deemed to be a "major Federal action" to which NEPA's mandates apply. *See Sierra Club v. Sigler,* 695 F.2d 957, 964 (5th Cir.1983).[4] NEPA is a procedural act, mandating a process rather than a result. *See Sierra Club v. Espy,* 38 F.3d 792, 796 (5th Cir.1994). NEPA does not require that an agency select an environmentally favorable course of action, but only that the agency make its decision to proceed with a particular action after taking a "hard look" at the potential environmental consequences. *Sabine River Auth. v. United States Dep't of Interior,* 951 F.2d 669, 676 (5th Cir.1992) (quoting *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 350, 109 S.Ct. 1835, 1846, 104 L.Ed.2d 351 (1989)). NEPA prohibits uninformed, not unwise, agency actions. *Sabine River,* 951 F.2d at 676.

 An EIS must contain a "detailed statement of the expected adverse consequences of an action, the resource commitments involved in it, and the alternatives to it." *Kleppe v. Sierra Club,* 427 U.S. 390,

401–02, 96 S.Ct. 2718, 2726–27, 49 L.Ed.2d 576 (1976). In order to determine whether an EIS is required, the agency usually prepares an environmental assessment ("EA"), which is a rough, less detailed statement intended to determine whether environmental impacts are significant enough to require the preparation of an EIS. *Espy,* 38 F.3d at 802. If the EA concludes that the action will have no significant impact on the quality of the human environment, no EIS is required. *Id.* at 796.

## II. FACTUAL BACKGROUND

This litigation arises over the Corps' issuance under CWA section 404 of Permit No. 20271 to the City of Lake Jackson to construct a golf course. The golf course as proposed will be constructed on a 200–acre tract of forest and wetlands adjacent to the Brazos River near the Gulf of Mexico in Lake Jackson, Brazoria County, Texas. In 1979, the City of Lake Jackson created a comprehensive development plan, which included plans for a public golf course. Ten years later, the City purchased a 400–acre tract of land, located within its extraterritorial jurisdiction, for the purpose of constructing the golf course. The City then began implementing the procedures necessary to approve the construction of the golf course.

In November of 1990, the City requested that the Corps make a jurisdictional determination of the 400–acre tract. At the outset, the Corps identified a large area of wetlands concentrated on the lower 200 acres of the tract. Following this identification, the City scaled down the golf course design, deciding to build an eighteen-hole course rather than a thirty-six hole course, so as to avoid impacting the substantial wetlands on the lower 200 acres.

The upper 200 acres of the tract are part of a 1,200 contiguous acre parcel of bottomland hardwoods forest. In December of 1992, the City submitted a delineation of this tract to the Corps, with its own assessment

---

**4.** A non-federal activity becomes a federal action requiring NEPA analysis if it cannot "begin or continue without prior approval of a federal agency." *Maryland Conservation Council, Inc. v. Gilchrist,* 808 F.2d 1039, 1042 (4th Cir.1986)

(citing *Biderman v. Morton,* 497 F.2d 1141, 1147 (2d Cir.1974) and *Foundation on Economic Trends v. Heckler,* 756 F.2d 143, 155 (D.C.Cir. 1985)).

that the property contained 7.15 acres of jurisdictional wetlands. Disagreeing with this number, the Corps conducted intensive redelineation in consultation with the U.S. Department of Agriculture's Natural Resource Conservation Service, and ultimately determined that the upper 200–acre tract contained 24 .34 acres of jurisdictional wetlands. Abiding by the Corps' determination, the City then redesigned its golf course, avoiding all but approximately two acres of scattered "fringe" wetlands. The impacted wetlands range in size from a couple of feet in diameter to less than one-quarter of an acre each.

In conducting its delineation of the jurisdictional wetlands, the Corps worked extensively with the Environmental Protection Agency ("EPA") and the U.S. Fish and Wildlife Service ("FWS"). The Corps also enlisted the aid of the U.S. Department of Agriculture to participate in field investigations of the wetland soils. The Corps invited the EPA and the FWS to attend a delineation verification on June 21, 1994, at which time the EPA and the FWS agreed that the Corps' delineation methods were sound. However, the representative from the FWS indicated that he may have concerns about the delineation process if the City applied for a permit, due to a need for more information. Thereafter, on June 28, 1994, the Corps submitted the delineation to the EPA, which is the agency charged with oversight of the section 404 program, for approval. On August 24, 1994, the EPA concluded that the Corps' determination represented "a reasonable interpretation of the geographic extent of jurisdictional waters of the United States including wetlands." The EPA further affirmed that the Corps' case specific determination would represent the Government's position in any subsequent Federal action or litigation regarding the case. The EPA concluded that the 200–acre site is clearly typical of a floodplain forest and not a "wetland per se."

Following the completion of the Corps' jurisdictional determination process, the City presented its redesigned plans for the golf course to the Corps, and applied for a permit on February 8, 1995. A public notice regarding receipt of the application and a request for public comments was issued by the Corps on March 27, 1995. Comments were received from the EPA and FWS, in addition to several citizens. The EPA raised concerns about the impacts to the habitat of neotropical migratory birds, secondary and indirect impacts to the wetland areas, and the investigation of less environmentally damaging practicable alternatives. The EPA also recommended that the Corps further examine the data used in delineation because of concerns raised by the FWS. Because of its concerns and its conclusion that impacts to wetlands would be considerable, the EPA recommended that the permit not be issued as proposed.

The FWS also responded to the Public Notice, and also recommended that the permit not be issued as proposed. The FWS voiced concerns similar to those of the EPA, including degradation of wetlands and bottomland hardwood forest without mitigation, potential impacts on native wildlife species such as neotropical migratory birds, failure to consider practicable alternatives, in addition to concerns about sheetflow alterations.

The Corps complied with the EPA's recommendation that it reconsider its jurisdictional determination by considering the FWS data cited by the EPA, but determined that the data did not warrant reevaluation of the jurisdictional determination. The EPA concurred in that determination. With regard to the EPA and FWS's concerns regarding impacts of the project to hardwood forest areas and migratory birds, the Corps declined to consider such impacts, contending that upland forest areas are not within the Corps' jurisdiction. The Corps also declined to consider alternative sites outside of the City's territorial jurisdiction, because it found that those sites would not serve the project's purpose of constructing a golf course in Lake Jackson.

Upon evaluating all of the public comments it received, the Corps made a finding that the proposed project's potential for environmental impact would not be significant, and therefore did not prepare an EIS. It also found that there were no practicable alternative sites, and that the project's potential

impacts had been avoided or minimized to the maximum extent practicable. Accordingly, the Corps granted the section 404 permit on February 12, 1996.

Pursuant to standard policy, the FWS referred the grant of the permit to the Assistant Secretary of the Army for Civil Works, who reviewed FWS's concerns and conducted a separate investigation. The Assistant Secretary agreed with the Corps' jurisdictional determination, and with the Corps' conclusions that the impacts to the jurisdictional wetlands would be insignificant and the mitigation requirements would be adequate. On May 20, 1996, the Plaintiffs filed the present action, challenging the issuance of Permit No. 20271 to the City of Lake Jackson.

## III. STANDARD OF JUDICIAL REVIEW

■ In the absence of a statutory review standard, the Court must look to the standard established by the Administrative Procedure Act ("APA"), 5 U.S.C. § 706. *Sierra Club v. Glickman,* 67 F.3d 90, 96 (5th Cir. 1995). Except for agency actions that are adjudicatory in nature, the APA provides that agency actions shall not be set aside unless found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A). In this inquiry under the APA, the Court is limited to consideration of the evidence contained in the administrative record; a *de novo* review is improper. *See Camp v. Pitts,* 411 U.S. 138, 142, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106(1973).

■ The APA's "arbitrary and capricious" standard of review is very narrow, and mandates judicial deference to conclusions and actions of the agency. "Under this standard, administrative action is upheld if the agency has considered the relevant factors and articulated a rational connection between the facts found and the choice made." *Glickman,* 67 F.3d at 97. While the reviewing Court must make a careful and searching inquiry into the facts, the Court may not substitute its own judgment for that of the agency. The agency's decision need not be ideal, as long as it is not arbitrary and capricious and the agency gave at least minimal

consideration to the relevant facts contained in the record. *State of Louisiana ex rel. Guste v. Verity,* 853 F.2d 322, 327 (5th Cir. 1988).

■ In reviewing the agency's scientific factfindings, the Court must be especially deferential. *Baltimore Gas and Elec. Co. v. Natural Resources Defense Council, Inc.,* 462 U.S. 87, 103, 103 S.Ct. 2246, 2255, 76 L.Ed.2d 437 (1983). "We must look at the decision not as the chemist, biologist, or statistician that we are qualified neither by training nor experience to be, but as a reviewing court exercising our narrowly defined duty of holding agencies to certain minimal standards of rationality." *Ethyl Corp. v. Environmental Protection Agency,* 541 F.2d 1, 36 (D.C.Cir.1976) (en banc) (footnote omitted). The Corps must be allowed discretion to rely on the reasonable opinions of its own qualified experts even though the Court might find contrary views more persuasive. *Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 378, 109 S.Ct. 1851, 1861, 104 L.Ed.2d 377 (1989).

It is within the confines of this narrow standard that the Court must consider the summary judgment motions now presented. Of course, summary judgment is appropriate only if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56. A fact is material if its resolution in favor of one party might affect the outcome of the suit under governing law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Summary judgment should not be granted if the evidence indicates that a reasonable factfinder could find in favor of the non-moving party. *Id.; see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Because the Court is limited to review of the administrative record, and Plaintiffs' request to present additional evidence and supplement the record was denied, summary judgment resolution on the record presented is proper in this case.

## IV. PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Plaintiffs request summary judgment on four of the claims alleged in their First Amended Complaint. Specifically, they request summary judgment on the following counts: (A) Count One: that the Corps illegally limited the scope of practicable alternatives required to be analyzed under 40 C.F.R. § 230.10(a) of the CWA section 404(b)(1) guidelines; (B) Count Two: that the Corps failed to make proper factual determinations as required by 40 C.F.R. §§ 230.11 and 230.12; (C) Count 3(B): that the Corps failed to comply with NEPA's cumulative impacts analysis; and (D) the claims contained within Count Two that the Corps did not consider construction of the proposed drainage ditch in its review of the permit application.

### A. *Count One: Consideration of Practicable Alternatives*

■ In Count One, Plaintiffs contend that sites outside of the City's extraterritorial jurisdiction should have been considered in the analysis of practicable alternatives under 40 C.F.R. § 230.10(a). Plaintiffs claim that because the Corps failed to require that the City analyze alternatives outside of its extraterritorial jurisdiction, the presumption contained in 40 C.F.R. § 230.10(a)(3) that "practicable alternatives ... are presumed to be available, unless clearly demonstrated otherwise" was not overcome. The Corps does not dispute that alternatives outside of the City of Lake Jackson's extraterritorial jurisdiction were not considered; rather, it contends that consideration of such sites was not required because a golf course outside of Lake Jackson would not fulfill the project purpose of building a municipal golf course in the City of Lake Jackson.

The regulations enacted pursuant to section 404 require that no discharge activities are permitted "if there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem." 40 C.F.R. § 230.10(a). "An alternative is practicable if it is available and capable of being done after taking into consideration cost, existing technology, and logistics *in light of overall project purposes.*" *Id.* § 230.10(a)(2) (emphasis added). Again, in cases where the discharge is proposed for "special aquatic sites"[5] and the project is not water-dependent, the regulations provide a presumption that practicable alternatives are available unless clearly demonstrated otherwise. 40 C.F.R. § 230.10(a)(3).

The Federal Defendants dispute Plaintiffs' contention that alternative sites outside of the City of Lake Jackson should have been considered, arguing that "the permittee's purpose was to build a golf course *within* the City of Lake Jackson." The regulations were adopted with the idea that it is "implicit that, to be practicable, an alternative must be capable of achieving the best purpose of the proposed activity." *Louisiana Wildlife Fed'n, Inc. v. York,* 761 F.2d 1044, 1048 (5th Cir.1985) (quoting 45 Fed.Reg. 85339). Although the applicant's purpose must be legitimate, *see Friends of the Earth v. Hintz,* 800 F.2d 822, 833 (9th Cir.1986), "it would be bizarre if the Corps were to ignore the purpose for which the applicant seeks a permit and to substitute a purpose it deems more suitable." *York,* 761 F.2d at 1048.

The City of Lake Jackson has been planning to build a municipal golf course since 1979. It has been working affirmatively toward that goal since 1990. The City's purpose is to provide an affordable, quality public golf course for the citizens of Lake Jackson. At present, the City's inhabitants must either do without a public golf course, or travel to the neighboring municipalities to find appropriate facilities. Clearly, the City's purpose of providing a local, affordable golf course would be thwarted if the golf course could not be constructed within the City's extraterritorial jurisdiction.

■ Moreover, not only is it permissible for the Corps to consider the applicant's purpose in considering practicable alternatives, the Corps has an affirmative duty to

---

**5.** "Special aquatic sites" are defined as "geographic areas ... possessing special ecological characteristics of productivity, habitat, wildlife protection, or other important and easily disrupted ecological values," and include wetlands. *See* 40 C.F.R. §§ 230.3(q–1), 230.41.

accord weight to the objectives of the applicant. *York*, 761 F.2d at 1048. Therefore, the Court finds that it was within the Corps' discretion to consider alternatives only within the City of Lake Jackson's extraterritorial jurisdiction. The record reveals that at least eight alternatives within the City's jurisdiction were considered and rejected on legitimate grounds, including the alternative of no action. Plaintiffs do not dispute the adequacy of the consideration given to these alternatives. Accordingly, Plaintiffs' Motion for Summary Judgment on Count One is DENIED.

### B. *Count Two: Adequacy of Factual Determinations Under the Section 404(b) Guidelines*

In Count 2, Plaintiffs claim that the Corps failed to fully and fairly conduct factual determinations under the section 404(b)(1) guidelines. Plaintiffs Count 2 consists of five subparts. Count 2(A) alleges a failure to properly analyze water circulation and fluctuation as required by 40 C.F.R. § 230.11(b). Count 2(B) alleges a failure to make proper aquatic ecosystem and organism determinations as required by 40 C.F.R. § 230.11(e). Count 2(C) alleges that the Corps' factual determinations of cumulative effects on the aquatic ecosystem under 40 C.F.R. § 230.11(g) were inadequate. Count 2(D) alleges a failure to properly analyze secondary effects as required by 40 C.F.R. § 230.11(h). Count 2(E) alleges that the factual findings necessary to make compliance determinations under 40 C.F.R. § 230.12 are flawed, and that therefore a finding of compliance under that section is not supported by the record.

### 1. *Specific Factual Findings Under Section 230.11*

Generally, 40 C.F.R. § 230.11 and its subparts require the permitting authority to "determine in writing the potential short-term or long-term effects of a proposed discharge of dredged or fill material on the physical, chemical, and biological components of the aquatic environment." Subpart (b) requires that the nature and degree of effect of the discharge on water circulation, fluctuation,

and salinity be determined, but provides that "[p]otential *significant* effects on the [above factors] shall be evaluated on the basis of the proposed method, volume, location, and rate of discharge." (emphasis added). Thus, a higher standard is imposed where the permitting authority finds a potential significant effect. In this case, the Corps specifically found that no significant impacts could be expected, due to the City's avoidance of the concentrated areas of wetlands in the golf course plans, and the resultant impact only on the "fringes." The Corps' conclusions in the EA indicate that the required factors were considered, and that "any impact to the existing hydrology of this site will be minimal."

Subpart (e) similarly requires consideration of the nature and degree of the effects on the aquatic ecosystem. It further requires that "[p]ossible loss of environmental values (§ 230.31), and actions to minimize impacts (subpart H) shall be examined." In this case, the Corps considered these factors, and evaluated the actions that would be taken to minimize impacts. Specifically, the Corps found that impacts to the aquatic resources would be minimal, and that certain measures would be undertaken to ensure minimal impacts. These include requiring pesticides to be EPA-approved, requiring maximum saturation at the point of application of the pesticide and minimal runoff, requiring chemicals to be diluted before entering the project's drainage system in the event of flooding, and, in order to further minimize any potential impact of fertilizer or pesticide runoff, requiring the City to construct wetland sediment traps to serve as filters. The Corps also noted that the City would employ practices such as silt fences or hay bales to minimize filtration and erosion during construction.

Moreover, subpart (e) states that "[t]ests as described in § 230.61 (Evaluation and Testing) *may* be required to provide information on the effect of the discharge material." (emphasis added). This implies that evaluation and testing is not always required. The Corps in this case did not do extensive testing because of its conclusion that effects on the aquatic ecosystem would be minimal.

Subpart (g) requires a determination of the cumulative effects on the aquatic ecosystem. It defines cumulative impacts as "the changes in an aquatic ecosystem that are attributable to the collective effect of a number of individual discharges of dredged or fill material." 40 C.F.R. § 230.11(g)(1). These effects "should be predicted to the extent reasonable and practical." 40 C.F.R. § 230.11(g)(2). The regulations simply require the permitting authority to *consider* cumulative effects on the aquatic ecosystem in the permit process.

The Plaintiffs attack the Corps' consideration of cumulative effects on the aquatic ecosystem in several ways. First, they claim that the Corps based its analysis on "historical permitting activities." A review of the EA, however, indicates that the Corps merely considered such activities as a component of the cumulative effects from past activities. Plaintiffs' argument here has no merit.

■ Next, Plaintiffs argue that the Corps failed to address the cumulative effects of the proposal on migrating neotropical songbirds. While this assertion is true, this claim is properly brought not under 40 C.F.R. § 230.11(g), which requires analysis of aquatic ecosystems, but under NEPA. This claim, therefore, is discussed below in the Court's analysis of cumulative impacts under NEPA.[6] Similarly, Plaintiffs' final allegation[7] is that the Corps failed to take into consideration the loss of the larger 1,600–acre forest adjacent to the site, or the loss of the Columbia Bottomlands where the proposed golf course site lies. Again, this claim is addressed under the Court's discussion of the cumulative impacts analysis under NEPA.

■ Subpart (h) requires a determination of the secondary effects of the proposal on the aquatic ecosystem. Secondary effects are defined as those "effects on an aquatic ecosystem that are associated with a discharge of dredged or fill materials, but do not result from the actual placement of the dredged or fill material." Section 230.11(h) requires merely that "information about sec-

ondary effects on aquatic ecosystems shall be considered prior to the time final section 404 action is taken by permitting authorities." The Corps adequately considered information regarding secondary effects, by considering alterations in sheetflow, and effects on various animal species and wildlife habitat. The Corps concluded that impacts would be minimal, that construction would not result in a significant loss of floodplain storage, and that there would be no impacts on water quality because there would be no point sources of pollution. The record clearly shows that the required factors were considered. Such findings are sufficient under the arbitrary and capricious standard.

## 2. *The Corps' Level of Analysis Was Appropriate*

■ Plaintiffs challenge the factual findings discussed above on the ground that the Corps did not perform a sufficiently detailed analysis of the appropriate factors. Plaintiffs base this argument on the existence in the record of comments from the EPA and FWS regarding the extensive impacts of the proposal on the twenty-four acres of wetlands contained in the proposed 200–acre tract. Plaintiffs argue that there are insufficient analytical and factual findings in the record to support a determination of compliance with the 404(b)(1) guidelines or to support the findings in the EA prepared by the Corps.

Plaintiffs' argument that the Corps did not conduct a thorough investigation of the factors required in 40 C.F.R. § 230.11 is misplaced. First, the Corps' findings under section 230.11, as discussed previously, meet the minimal standards of rationality required to withstand the Court's review. *See Ethyl Corp. v. Environmental Protection Agency,* 541 F.2d 1, 36 (D.C.Cir.1976) (en banc). The record shows that the Corps considered the relevant factors.

Next, out of 207 total acres allocated for the golf course, only approximately twenty-

---

**6.** *See infra* discussion in section IV.C.

**7.** Also in Count Two, Plaintiffs claim that the Corps failed to consider the cumulative impacts

of the drainage ditch on the aquatic ecosystem. Analysis of the alleged drainage ditch is discussed *infra* in section IV.D.

four consist of wetlands. These twenty-four acres are not contained in one single area, but are scattered throughout the site. Moreover, only about two acres of those scattered jurisdictional wetlands will be directly impacted by construction of the golf course. Therefore, the Corps' finding that the total wetland impact of the project is relatively minimal is not arbitrary or capricious.

■■■ More importantly, the degree of documentation required to support a section 404 permitting decision must correspond to the degree of risk the proposed project poses to the aquatic environment. The 404 regulations themselves mandate that:

> The Guidelines user, including the agency or agencies responsible for implementing the Guidelines, must recognize the different levels of effort that should be associated with varying degrees of impact and require or prepare commensurate documentation. The level of documentation should reflect the significance and complexity of the discharge activity.

40 C.F.R. § 230.6(b). Using this discretion, the Corps determined that, given the minimal acreage and minimal risks found to be associated with the discharge, its analysis was sufficient. The Court cannot find that this decision was either arbitrary or capricious.[8]

■■■ Plaintiffs rely heavily on the fact that both the FWS and EPA expressed misgivings about the permit to argue that the Corps was required to make intensive, detailed factual findings regarding the impacts of the proposal. Although the Corps must consider the comments of other agencies in evaluating a particular proposal, it is within the Corps' discretion to determine what level of analysis is required in its permitting decision. The arbitrary and capricious standard by which the Court is bound is a narrow one; the Corps is entitled to rely completely on the opinions of its own experts "even if the reviewing court finds the opinions of other experts equally or more persuasive." *Sabine River Authority v. United States Dept. of Interior,* 951 F.2d 669, 678 (5th Cir.1992) (citation omitted). Plaintiffs' argument that the existence in the record of strong comments from these other agencies raises the level of analysis that is required is simply wrong.

To support their claim that heightened analysis is required by the comments of the EPA and FWS, Plaintiffs cite to an EPA/Corps Field Memorandum discussing the "Appropriate Level of Analysis Required for Evaluating Compliance with the Section 404(b)(1) Guidelines Alternatives Requirements" attached to their Motion. *Nowhere* does this document state that the comments of other agencies heighten the analysis required. In fact, in regard to cooperation with other agencies, it merely states that "[t]he Corps Districts and EPA Regions will, through the standard permit evaluation process, coordinate with the [FWS], National Marine Fisheries Service and other appropriate state and Federal agencies in evaluating the likelihood that adverse impacts would result from a particular proposal."[9] The record is clear that the Corps did cooperate with the appropriate agencies—the EPA and FWS—by soliciting their opinions and responding to their comments in the EA.

8. Plaintiffs also interject an argument in their Motion for Summary Judgment that the Corps' scientific analysis of impacts under the section 404(b) guidelines is inadequate in light of the standards set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). *Daubert* is a landmark case which sets forth the principles a trial judge must consider in determining whether scientific evidence is admissible in a trial, in order to prevent a factfinder's consideration of unreliable evidence or "junk science." It does not apply to APA review of agency action. The Court's task under the APA is to ensure that the agency's decisions are not arbitrary or capricious; it is not to evaluate their scientific methods. The agency in this case is the factfinder,

and the Court must give a high degree of deference to its expertise. *See Ethyl Corp.,* 541 F.2d at 36. Therefore, *Daubert* is inapplicable to the proceedings at hand.

9. In fact, the Field Memorandum hurts rather than helps the Plaintiffs' argument. It reiterates the mandate in 40 C.F.R. § 230.6, emphasizing those passages that state "[i]t generally is not intended or expected that extensive testing, evaluation or analysis will be needed to make findings of compliance in ... routine cases" and that "[t]he level of documentation should reflect the significance and complexity of the discharge activity." *See* 40 C.F.R. §§ 230.6(a), 230.6(b).

Therefore, the Corps did what was required of it. *See Sierra Club v. United States Army Corps of Eng'rs,* 772 F.2d 1043, 1054 (2d Cir.1985) (Corps is not bound to agree with the conclusions reached by other agencies, but is simply required to listen to and consider their views in the decisionmaking process).

Moreover, the Corps did not simply ignore the comments it received on the application. In the EA, it addressed the EPA and FWS's concerns about construction erosion, pesticide runoff, and wetland habitat fragmentation, finding such impacts to be avoidable and/or minimal. It also addressed the FWS's concerns about sheetflow diversion, concluding that "through proper golf course design and prudent and practical construction methods, impact on the existing hydrology of this site will be minimal." The record also shows that the FWS referred the Corps' permit grant to the Assistant Secretary of the Army for Civil Works, who reviewed the FWS's concerns, reviewed the Corps' decision documents and draft permit, toured the site, and conducted interviews with Corps staff, City consultants and representatives, and FWS field office staff. Upon completing his investigation, the Assistant Secretary found that the impacts to the limited jurisdictional wetlands would be insignificant, and that the mitigation required by the District would be adequate.

Also important to this Court's finding that the Corps did not abuse its discretion in limiting its section 404 wetlands analysis to that reflected in the EA are the following considerations. First, the City has extensively curtailed its plans for the golf course in response to wetland concerns. Initially planning to build a 36–hole golf course, it reduced the scope by half to avoid the impact of wetlands on the lower 200–acre tract. Next, when the Corps determined that the upper 200–acre tract contained 24.5 acres of jurisdictional wetlands, the City once again redesigned its plans for the course, managing to avoid the direct impact of all but two acres, an impact the Corps determined to be

unavoidable. Next, the City has conceded to comprehensive and extensive measures designed to ensure that the construction process will prevent direct and secondary impacts to the maximum extent possible. Further, the golf course will incorporate several water/wetland areas as part of the design, providing some habitat and restoring environmental value. Finally, the City has agreed to perform substantial remedial work on the lower 200–acre tract, protecting the wetlands there from erosion and downstream sedimentation, preventing further habitat loss and degradation, and protecting the hydrology of bottomland wetlands associated habitat. These concessions by the City have minimized to a great extent the impacts associated with the construction of the golf course. Because the impacts have been minimized, the Court finds that the Corps' factfinding procedures were adequate in light of the lesser level of analysis required. Accordingly, Plaintiffs' Motion for Summary Judgment on Count Two, adequacy of factual determinations under section 404(b)(1), is **DENIED.** Defendants' Motion for Summary Judgment on such claims is correspondingly **GRANTED,** and such claims are **DISMISSED WITH PREJUDICE.**

C. *Count 3(B): Cumulative Effects Under NEPA*

In Count 3(B),[10] Plaintiffs allege inadequacy in the cumulative impacts analysis under NEPA and its accompanying regulations. Plaintiffs argue for summary judgment on the basis that specific cumulative impacts regarding neotropical migrant songbirds have not been considered in the decisionmaking process as required by NEPA. The CEQ regulations define cumulative impact as "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or

---

**10.** Although Plaintiffs argue for summary judgment on Count 3(C), the claim that they actually discuss is Count 3(B). While Count 3(C) claims a failure to analyze indirect impacts, Count 3(B) alleges a failure to discuss cumulative impacts.

Plaintiffs' Motion for Summary Judgment addresses cumulative impacts. Therefore, the Court will presume that Plaintiffs move for summary judgment on Count 3(B).

person undertakes such other actions." 40 C.F.R. § 1508.7.

The Corps has responded to Plaintiffs' argument by stating that it undertook two levels of inquiry into the cumulative impacts of the project. First, the Corps solicited comments from sister agencies and the public, incorporated those comments into the administrative record, and responded to them in the EA. The Corps contends that it gave the requisite "hard look" at the cumulative impacts of the project under NEPA because it did acknowledge and incorporate these comments into the EA.

Second, the Corps contends that it conducted its own independent analysis of the cumulative impacts of the proposal taking into consideration past, present, and reasonably foreseeable future actions. In support of this contention, the Corps claims that it acknowledged past impacts by stating in the EA that past actions have taken their toll on the forest, leaving the current 1,600–acre forest as "one of the few remaining stands left in this area." With respect to present impacts, the Corps acknowledged that most of the 200–acre area is comprised of upland forest which provides an important resource as wildlife habitat, but disclaimed any responsibility over the fragmentation resulting from the proposal because "these upland forest are not within our regulatory jurisdiction." The Corps concluded by stating "[t]herefore, continued fragmentation is likely in those nonjurisdictional areas which are under private ownership."

It is the Corps' treatment of present impacts that this Court finds most troubling. Basically, the Corps acknowledged that fragmentation would occur, but did absolutely no analysis of the extent of the impact on the forest, migratory birds, or any other wildlife species because it disclaimed jurisdiction over those areas and impacts. Further, the Corps acknowledged that although there are currently no other projects proposed in the area, future development is "likely." The Corps then stated in the same paragraph "[h]owever, any filling into waters of the U.S. would require Department of the Army authorization. We would evaluate these proposals on a case-by-case basis requiring applicants to avoid, minimize, and compensate, if necessary, for any *wetland impacts.*" (emphasis added). This paragraph acknowledges the concern that past development has fragmented the upland forest, at the same time assuring the reader that any future impacts would require Corps authorization and minimization of wetland impacts. However, this particularized reassurance clearly can do nothing to assuage fears of further fragmentation of the *forested areas,* since the Corps has expressly disclaimed jurisdiction over that aspect of any current or future proposals. Therefore, the Federal Defendants' assertion in their Response to Plaintiffs' Motion that the Corps gave a hard look at the cumulative impacts of the fragmentation of the forest and consequent loss of habitat for neotropical migrant birds is simply not true.[11] In the EA, the Corps specifically disavowed any responsibility to look at

---

11. Further, the Court notes that the Federal Defendants are apparently trying to mislead the Court by first disavowing any jurisdiction over the upland forest areas, while at the same time claiming that even though not required to, the Corps did address the cumulative impacts on neotropical migratory birds. It appears clear that only a cursory glance at the impact on birds was given, and even then only the impact from the loss of two acres of *wetlands* was considered. Plaintiffs' argument is not that the Corps did not assess the impact on these birds from the loss of *wetlands,* but from the loss of the *forested areas.* The Federal Defendants persist in their argument that they did in fact consider the cumulative effects of the project on neotropical migratory birds right to the end, in their Reply to the Plaintiffs' Response to the Federal Defendants Motion for Summary Judgment, in which nothing was mentioned about their jurisdictional argument. Obviously, the Corps did not even address the effects of the forest fragmentation on the birds at issue. To assert that it did so is blatantly false, because the issue is clearly whether such consideration was required.

In another example of the inconsistency that plagues their position, the Federal Defendants state in the Motion for Summary Judgment that the EA analyzed and determined that future fragmentation of the larger 1,600–acre forest would be "minimal," citing the AR at 0610. Federal Defendants' Motion at 49. On that page, however, the Corps stated that within the 1,600–acre forest, continued fragmentation is *likely.* Minimal impacts were found in regard to the *wetlands* contained in those areas, not in regard to fragmentation of the forest. The Court deeply resents the Federal Defendants' misrepresentations and attempts at confusion in this regard.

the cumulative impacts of forest degradation on these birds.[12] In disclaiming responsibility for the degradation of the forest and bird habitat, the Corps stated that it was asked to permit only the fill of two acres of wetlands. Specifically, the Corps stated: "The Corps jurisdiction and its NEPA obligations do not extend to include the upland area and the bird habitat there." In this case, then, the question is: Is the Corps required to analyze the cumulative impacts resulting from the clearing of 115 acres of mature bottomland hardwood forest before granting the section 404 permit to fill the wetlands on those acres?

The Court notes that neither party has adequately briefed this issue. The Corps' action in granting the section 404 permit is clearly considered a "major Federal action" significantly affecting the quality of the human environment, and consequently requires a NEPA analysis. *See Sierra Club v. Sigler,* 695 F.2d 957, 964 (5th Cir.1983). The legal issues presented, however, are whether the clearing and fragmentation of the forested areas are part of the same federal activity for which the Corps has jurisdiction and responsibility, and whether the Corps has a responsibility to evaluate these impacts regardless of its jurisdictional scope. If the answer to either of these questions is yes, then the Corps did not perform its statutory duty under NEPA, and the granting of the permit must be remanded for further consideration.

### 1. *The Extent of the Corps' Jurisdiction*

██ NEPA does not specify the scope of analysis required of federal agencies when evaluating projects that involve several different activities. However, the regulations enacted pursuant to NEPA by the Council on Environmental Quality ("CEQ") provide:

> b. Scope of Analysis. (1) In some situations, a permit applicant may propose to conduct a specific activity requiring a Department of the Army (DA) permit (e.g., construction of a pier in a navigable water of the United States) which is merely one

component of a larger project (e.g., construction of an oil refinery on an upland area). The district engineer should establish the scope of the NEPA document (e.g., the EA or EIS) to address the impacts of the specific activity requiring a DA permit and those portions of the entire project over which the district engineer has sufficient control and responsibility to warrant Federal review.

> (2) The district engineer is considered to have control and responsibility for portions of the project beyond the limits of Corps jurisdiction where the Federal involvement is sufficient to turn an essentially private action into a Federal action. These are cases where the environmental consequences of the larger project are essentially products of the Corps permit action.

> Typical factors to be considered in determining whether sufficient "control and responsibility" exists include:

> (i) Whether or not the regulated activity comprises "merely a link" in a corridor type project (e.g., a transportation or utility transmission project).

> (ii) Whether there are aspects of the upland facility in the immediate vicinity of the regulated activity which affect the location and configuration of the regulated activity.

> (iii) The extent to which the entire project will be within Corps jurisdiction.

> (iv) The extent of cumulative Federal control and responsibility.

33 C.F.R. pt. 325, app. B, subd. 7(b). Although the Corps has not cited this regulation as authority for its jurisdictional disclaimer over the upland forest, the regulations have been upheld as a permissible interpretation of NEPA, *see Sylvester v. United States Army Corps of Eng'rs,* 884 F.2d 394, 399 (9th Cir.1989), and therefore guide the Court's determination of NEPA's scope in the current proposal.

---

**12.** The Corps claims that it looked at the impacts on birds that will be affected by the filling of wetlands. This analysis consisted of checking a box on a short form, stating that the activity will not violate the requirements of any federally des-

ignated marine sanctuary. Apart from questions about its adequacy, such a finding does not address the Plaintiffs' concerns regarding the fragmentation of the forest on neotropical migratory birds. *See supra* note 11.

In all of the cases in which Corps jurisdictional disclaimers have been upheld, the activities involving waters of the United States, and therefore invoking Corps jurisdiction and NEPA, were physically, functionally, and logically separable from the activities held not subject to NEPA analysis. For example, in *Winnebago Tribe of Nebraska v. Ray*, 621 F.2d 269 (8th Cir.1980), the court upheld the Corps' determination that it was only required to consider the environmental impact resulting from the portion of a transmission line which traversed the river over which the Corps had jurisdiction. *Id.* at 273. The court rejected arguments by the plaintiff that the Corps had to consider the environmental effects of the entire 67 miles of the transmission line, as opposed to only the 1.25 mile portion crossing the river. *Id.*

Similarly, in *Sylvester*, the plaintiffs argued that the Corps should have considered the impact of the entire proposed resort, including the resort village and ski runs which would be located on neighboring uplands. *Sylvester*, 884 F.2d at 397. The Ninth Circuit upheld the Corps' determination that its NEPA review of the environmental effects of the proposed resort should be limited to the construction of the golf course on a meadow containing wetlands, the only affected area containing wetlands. *Id.* at 399. The court found that the statute was unclear as to the proper scope of analysis of NEPA review, and that the Corps' interpretation, as represented by the CEQ regulations,[13] was not an impermissible reading of the statute. *Id.*

The remaining cases cited by the Federal Defendants are examples of the same principle. In *Save the Bay, Inc. v. United States Corps of Eng'rs*, 610 F.2d 322, 327 (5th Cir. 1980), the Fifth Circuit held that NEPA review of an entire manufacturing plant was not necessary in the consideration of a permit for just one outfall pipeline. In *Enos v. Marsh*, 769 F.2d 1363 (9th Cir.1985), the

Ninth Circuit rejected the plaintiff's argument that an EIS for a federal harbor must also take into account the environmental impacts of shoreside facilities, such as berthing areas, terminals, roadways, and utility improvements. *Id.* at 1371–72. Finally, in *Friends of the Earth v. Coleman,* 518 F.2d 323 (9th Cir.1975), the court held that an EIS was not required for an entire airport development program where the federally funded projects were separate and distinct from the non-federally funded projects, local officials would proceed with or without the federal funding, and federal funding only comprised 10% of the total.[14] *Id.* at 327–29.

The CEQ regulations make it clear that a specific activity which is merely one component of a larger project should not require a DA permit unless the district engineer has sufficient control and responsibility to warrant Federal review. The cases cited above fit neatly into the categories which the regulations envision. This case does not. Although the Corps attempts to create the inference that the two acres of wetlands are in a nice, neat square of land, and that the "upland" area beyond this square cannot possibly be considered to be within the navigable waters over which the Corps has jurisdiction, it is undisputed that the two acres of wetlands that will be directly impacted are scattered throughout the 200–acre tract.[15] The impacted wetlands range in size from a couple of feet in diameter to less than one-quarter of an acre each. These facts lead the Court to the inescapable conclusion that the Corps' characterization of the project as a filling of the wetlands separate and distinct from the clearing of forest located on those wetlands is irrational. To suggest that the Corps has no jurisdiction to consider the environmental impacts of the fragmentation of the forest, even though it has jurisdiction to consider the impacts of the wetlands which co-exist underneath those very trees, is asinine on its face, and an impermissible abdica-

---

**13.** 33 C.F.R. pt. 325, app. B, subd. 7(b) (quoted *supra*).

**14.** Although the federal character of the action in *Coleman* was determined by federal funding, here it is the requirement of a section 404 permit that brings the activity within the scope of NEPA.

**15.** According to Plaintiffs, these wetland areas fall into roughly 720 discrete pockets that are interspersed throughout the tract.

tion of a federal agency's duties under NEPA.

The filling of the wetlands and the clearing of upland forest for the construction of Lake Jackson's golf course are not distinct projects with separate functions and independent justifications. *See Coleman,* 518 F.2d at 328–29. Rather, the golf course proposed is one activity, and the tasks necessary to accomplish it are so interrelated and functionally interdependent as to bring the entire project within the jurisdiction of the Corps, and therefore under the mandate of NEPA. *See Fritiofson v. Alexander,* 772 F.2d 1225, 1241 n. 10 (5th Cir.1985) (discussing the "independent-utility test" which requires that "[i]f proceeding with one project will, because of functional or economic dependence, foreclose options or irretrievably commit resources to future projects, the environmental consequences of the projects should be evaluated together").[16] The Federal Defendants' argument that the Corps does not have jurisdiction to consider the environmental consequences of felling trees that exist on jurisdictional wetlands rests on an artificial distinction. To accept the argument would be to override the basic purpose of NEPA: incorporating environmental considerations into federal decision-making processes.

## 2. *The Corps' Responsibility to Evaluate the Impacts on the Forested Upland Regardless of its Jurisdictional Scope*

■ Even ignoring the Corps' jurisdictional mandate to consider the cumulative effects of fragmenting the forest, the CEQ regulations require an analysis of cumulative effects on a broader level than the Federal Defendants acknowledge. As explained in *Fritiofson,* "[t]he regulations clearly mandate consideration of the impacts from actions that are not yet proposals and from actions— past, present, or future—that are not themselves subject to the requirements of NEPA." *Fritiofson,* 772 F.2d at 1243 (citing 40 C.F.R. § 1508.7 ("past, present, and reasonably foreseeable future actions *regardless*

of what agency (Federal or non-Federal) or person undertakes such other actions ") (emphasis added)). Therefore, even if the Corps does not have jurisdiction over the forested upland, it must nevertheless consider all of the cumulative impacts which result from the project, which clearly include the effects on the fragmentation of the forest.

In sum, it is clear that the Corps' decision not to consider the impacts of clearing 115 acres of forest containing wetlands and the related cumulative effects on migratory birds and other wildlife does not comport with the mandate of NEPA. The Corps plainly has sufficient control and responsibility over the area in question to have jurisdiction over the entire site. *See* 33 C.F.R. pt. 325, app. B, subd. 7(b)(1). Even more importantly, the CEQ has mandated that the permitting authority must consider *all* of the cumulative effects of the proposed project, not only those over which the Corps has current jurisdiction. Therefore, the Corps' duty under NEPA is to make full disclosure of the environmental impacts of this action. This cannot be achieved where, as here, the Corps has made no inquiry whatsoever into the nature of impacts to be expected. Accordingly, Plaintiffs' Motion for Summary Judgment on Count 3(B), the cumulative impact claim under NEPA, is hereby **GRANTED,** and the Court **ORDERS** that this case be **REMANDED** to the Corps for further consideration consistent with this opinion.

## D. *Construction of the Drainage Ditch*

■ Plaintiffs request declaratory and injunctive relief prohibiting the construction of a drainage ditch included in the golf course plans, which allegedly has the potential to impact wetlands.[17] The drainage ditch, although included in the plans for the golf course, apparently was not presented formally to the Corps in the section 404 permit application. The Corps has taken absolutely no action in regard to the proposed drainage ditch. Because no administrative action on this proposal has been taken, the claim is not ripe for adjudication. *See Howell v. United*

---

**16.** Although *Fritiofson* has been overruled on the standard of judicial review it employed, *see Sabine River,* 951 F.2d at 677–78, its substantive findings, including jurisdictional issues and the

Corps' duty with regard to cumulative effects, are not affected by the decision in *Sabine River.*

**17.** This claim is in Counts 2(A) and 2(B).

*States Army Corps of Eng'rs,* 794 F.Supp. 1072, 1075–76 (D.N.M.1992) (judicial review is premature where agency has not yet had sufficient time to apply its expertise, take appropriate action, and develop a full factual record). Accordingly, the Federal Defendants' Motion for Summary Judgment on the claims involving construction of a drainage ditch is hereby **GRANTED,** and such claims are **DISMISSED WITHOUT PREJUDICE.**

However, if the drainage ditch was included in the plans for the golf course, its construction is "reasonably foreseeable" and should be considered as a future action under the Corps' cumulative impacts analysis under NEPA. Therefore, upon remand of this case to the Corps to reconsider the cumulative impacts analysis under NEPA, the Corps should also consider the effects of the drainage ditch.

## V. THE FEDERAL DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

The Defendants have moved for summary judgment on all of the issues presented by the Plaintiffs' First Amended Complaint. The issues remaining to be discussed include Counts 3(A), 3(C), 4(B), Five, Six, and Seven.

### A. *NEPA Claims Under Count Three*

Plaintiff's Count Three is brought pursuant to NEPA. Count 3(A) alleges that the Corps failed to sufficiently address the direct and indirect hydrologic impacts of filling wetlands. Count 3(C) alleges that, under 40 C.F.R. § 1508.8, the Corps failed to adequately consider the indirect effects of the golf course on the larger forest tract before making its finding of no significant impacts ("FONSI").

The Court has previously addressed the Corps' analysis of the direct and indirect hydrologic impacts of filling wetlands under its discussion of the Corps' CWA section 404(b) factual findings.[18] With regard to the Corps' analysis of wetlands, the Court has found that the Corps adequately analyzed the impacts under 40 C.F.R. § 230.11 in the EA.

The analysis passes muster under NEPA as well. *See* 33 C.F.R. pt. 325, app. B, subd. 7(b) (EA should be combined with 404(b)(1) analysis); 40 C.F.R. § 1508.9 (EA should be brief and concise). Accordingly, the Federal Defendants' Motion for Summary Judgment on Count 3(A) claim is GRANTED, and that claim is DISMISSED WITH PREJUDICE.

The Court has also previously discussed the Corps' analysis of the cumulative effects of the golf course on the larger forest tract, and has found them to be inadequate.[19] This analysis applies equally to the Corps' analysis of the indirect effects of the golf course on the larger forest tract. Accordingly, the Federal Defendants' Motion for Summary Judgment on Count 3(C) is **DENIED.** It is **ORDERED** that this case is **REMANDED** to the Corps for further consideration of these indirect effects consistent with the Court's opinion.

### B. *The Corps' Jurisdictional Determination Under Count 4(B)*

Count 4(B) finds fault with the Corps' jurisdictional delineation of the wetlands on the 200–acre tract. Plaintiffs allege that the jurisdictional wetlands on the golf course site are much greater than those twenty-four acres identified by the Corps. When reviewing an agency's jurisdictional wetlands determination, the Court must apply the arbitrary and capricious standard; the Court may not substitute its own judgment for that of the Corps. *See Avoyelles Sportsmen's League, Inc. v. Marsh,* 715 F.2d 897, 917–18 (5th Cir.1983). In making its jurisdictional determination in this case, the Corps followed the 1987 Corps of Engineers Wetlands Delineation Manual (the "Manual"). The Manual identifies three basic wetlands characteristics: (1) wetlands hydrology; (2) wetlands (or "hydric") soils; and (3) wetlands (or "hydrophytic") vegetation. Manual at 13–14.

Essentially, Plaintiffs allege that many of the wetland soils on the golf course site are "Pledger clay soils," which are not classified as hydric soils *per se.* Nonethe-

---

18. *See supra* discussion in section IV.B.

19. *See supra* discussion in section IV.C.

less, Plaintiffs allege that these particular Pledger soils exhibit certain wetland characteristics, and that, according to the Corps' guidance, they should be considered hydric soils. In support of their argument that the Corps drastically underestimated the number of wetlands, the Plaintiffs argue that the FWS estimated wetland areas to be fifty-two acres at a minimum, and that the Corps ignored these as well as public comments pointing out discrepancies in their delineation.

The record reveals that the Corps undertook an extensive delineation process, cooperating with the EPA, the FWS, the Department of Agriculture, and the City's consultant in order to determine which areas constituted wetlands. The Corps also invited the EPA and the FWS to attend a delineation verification on June 21, 1994. At that meeting, the EPA and the FWS agreed that the delineation methodology was sound, although the FWS expressed reservations regarding the actual number of wetlands. Following this verification meeting, the Corps formally submitted their delineation to the EPA for approval. The EPA responded on August 24, 1994, agreeing with the Corps' delineation. The EPA found that the approach utilized and decisions made "were a reasonable representation of the geographic extent of jurisdictional 'waters of the United States' including wetlands." The EPA concluded by adopting the Corps' case specific determination as the Government's position in any subsequent federal action of litigation regarding this case.

Based on a review of the record, and the EPA's concurrence and full endorsement of the Corps' delineation, the Court cannot find as a matter of law that the Corps' jurisdictional determination was arbitrary, capricious, or an abuse of discretion. The Corps of Engineers is the agency charged with the responsibility of delineating wetlands, not the FWS. *See Sierra Club v. United States Army Corps of Eng'rs*, 772 F.2d 1043, 1054 (2d Cir.1985) (Corps is not bound to agree with the conclusions reached by other agencies, but is simply required to listen to and consider their views in the decisionmaking process).

Accordingly, the Federal Defendants' Motion for Summary Judgment on Count 4(B), the propriety of the jurisdictional determination, is **GRANTED,** and such claim is **DISMISSED WITH PREJUDICE.**

### C. *Adequacy of Mitigation*

Count Five alleges that, due to the Corps' faulty wetland delineation and analysis of secondary effects, it did not require an adequate amount of mitigation under 40 C.F.R. § 230.10(d) to make up for the wetlands that will be filled. Because the Court has ruled that the Corps' jurisdictional determination and section 404(b) analysis of the secondary effects on wetlands was sound, Count Five must be dismissed as well. Accordingly, the Federal Defendants' Motion for Summary Judgment on Count Five, the adequacy of mitigation requirements, is **GRANTED,** and such claim is **DISMISSED WITH PREJUDICE.**

### D. *Counts Six and Seven*

Count Six is a general challenge to the Corps' granting of the permit under 40 C.F.R. § 230.10(c), alleging that the Corps' decision was arbitrary and capricious, an abuse of discretion, and otherwise not in accordance with the law. Finally, Count Seven is a NEPA claim, in which Plaintiffs allege that the Corps' FONSI was arbitrary and capricious because the project will have significant impacts on the environment. Plaintiffs allege that the Corps should be required to issue an EIS before granting this permit. Because the Court has remanded the permit application for further consideration under NEPA, Plaintiffs' Counts Six and Seven cannot be adjudicated at this time. Accordingly, the Federal Defendants' Motion for Summary Judgment on Counts Six and Seven is **DENIED.**

### VI. CONCLUSION

For the reasons stated above, Plaintiffs' Motion for Summary Judgment is **GRANTED,** and/or the Federal Defendants' Motion for Summary Judgment is **DENIED,** as to Counts 3(B), 3(C), Six, and Seven of Plaintiffs' First Amended Complaint. The Court **ORDERS** that the section 404 permit in this case be **REMANDED** to the Corps for further consideration of the cumulative and indi-

rect effects of the proposed project under NEPA, in accordance with this opinion. On all other Counts, Plaintiffs' Motion for Summary Judgment is **DENIED,** and the Federal Defendants' Motion for Summary Judgment is **GRANTED.** Plaintiff's drainage ditch claims under Count Two are **DISMISSED WITHOUT PREJUDICE;** all other dismissed claims are **DISMISSED WITH PREJUDICE.** This case is hereby **ADMINISTRATIVELY CLOSED.** Plaintiffs may move to reopen the case, solely for further APA review of the remanded claims, upon completion by the Corps of the additional required analyses. The parties are **ORDERED** to bear their own costs and attorney's fees incurred herein to date.

IT IS SO ORDERED.

### *PARTIAL FINAL JUDGMENT AND ORDER OF ADMINISTRATIVE CLOSURE*

For the reasons stated in the Court's Order entered this date, Plaintiffs' Motion for Summary Judgment is **GRANTED,** and/or the Federal Defendants' Motion for Summary Judgment is **DENIED,** as to Counts 3(B), 3(C), Six, and Seven of Plaintiffs' First Amended Complaint. The Court **ORDERS** that the section 404 permit be **REMANDED** to the Corps for further consideration of the permit application in accordance with the Court's Order entered this date. On all other Counts, Plaintiffs' Motion for Summary Judgment is **DENIED,** and the Federal Defendants' Motion for Summary Judgment is **GRANTED.** Plaintiff's drainage ditch claims under Count Two are **DISMISSED WITHOUT PREJUDICE;** all other dismissed claims are **DISMISSED WITH PREJUDICE.** This case is hereby **ADMINISTRATIVELY CLOSED.** Plaintiffs may move to reopen the case, solely for further APA review of the remanded claims, upon completion by the Corps of the additional required analyses. The parties are **ORDERED** to bear their own costs and attorney's fees incurred herein to date.

IT IS SO ORDERED.