**SAVE OUR SONORAN INC., a non-profit corporation, Plaintiff,**

**v.**

**Lieutenant General Robert B. FLOWERS, in his official capacity as Commander, U.S. Army Corps of Engineers; Mark F. Sudol, in his official capacity as Chief of the Regulatory Branch of the U.S. Army Corps of Engineers, Los Angeles District; and 56ᵀᴴ & Lone Mountain, L.L.C., Defendants.**

**No. CV–02–00761–PHX–SRB.**

United States District Court, D. Arizona.

May 30, 2002.

Myron L Scott, Tempe, AZ, for Save Our Sonoran, Inc.

Richard Glenn Patrick, US Attorney's Office, Phoenix, AZ, for Robert B. Flowers, Mark F. Sudol.

Norman D James, Jay Lawrence Shapiro, Fennemore Craig PC, Phoenix, AZ, for Crismon & Baseline, L.L.C., 56th & Lone Mountain, L.L.C.

## ORDER

MARTONE, District Judge.

### I.

The court has had under submission plaintiff's motion for preliminary injunction. We have read the motion, the federal defendants' response, 56th & Lone Mountain's response, and plaintiff's reply. We have examined the administrative record, including the Environmental Assessment prepared by the Corps of Engineers. We have heard oral argument, and we now set forth our findings and rulings under Rule 52(a), Fed.R.Civ.P.

This is an action brought by Save our Sonoran, Inc. against the Corps of Engineers and 56th & Lone Mountain, a real estate developer, seeking judicial review of the Corps' decision to issue a permit for the construction of 66 road crossings and other facilities over the waters of the United States. The defendant 56th & Lone Mountain intends to build houses on an entire section of land encompassing about 608 acres in Phoenix. Although surrounded by other development, the section is desert, with washes running from east to west throughout the entire parcel. To service houses on the narrow sections of land that are surrounded by washes, the developer plans to fill the washes at 66 separate spots for road crossings. The maps that are a part of the administrative record show that the areas of crossing are scat-

tered throughout the whole section. *See, e.g.,* the map entitled "404 Impact Area Map." Thus, while the waters of the United States constitute about 5% of the total area, the washes are a dominant feature of the land and no development of the property could occur without affecting the washes.

On May 7, 2002, Judge Bolton (to whom this case is assigned) granted a temporary restraining order enjoining the defendants from engaging in any activities authorized by the permit in the washes and the immediately adjacent areas. Plaintiff now seeks a preliminary injunction pending the ultimate resolution of its claims on the merits.

## II.

One seeking a preliminary injunction must show either (1) a likelihood of success on the merits and the possibility of irreparable injury, *or* (2) the existence of serious questions on the merits and the balance of hardships tips in favor of the moving party. *Andreiu v. Ashcroft,* 253 F.3d 477 (9th Cir.2001).

A single issue dominates the merits of the claims and the defenses. Plaintiff claims that the Corps of Engineers' Environmental Assessment was too narrow in scope. The Corps looked simply at the washes and not the remainder of the section and found that there was no significant impact under the National Environmental Policy Act. The plaintiff, on the other hand, argues that the Corps of Engineers should have looked at the environmental impact of the project on the entire section and not just the washes because the washes are riddled throughout the section. The plaintiff also relies on the fact that the development of the site is dependent upon the issuance of the permit.

The scope of analysis of federal action by the Corps of Engineers under the National Environmental Policy Act of 1969,

42 U.S.C. § 4321 *et seq.* (West 1994 & Supp.2001), is a topic not without controversy. *See generally,* Timothy J. Hagerty, *Beyond 404: Corps Permitting and the National Environmental Policy Act* SF92 ALI–ABA 95 (2001), and David Paget, *NEPA'S "Small Handle" problem: The Scope of Analysis of Federal Action,* SG026 ALI–ABA 95 (2001). Indeed, in this very case, the United States Department of the Interior disagreed with the Corps' definition of its scope of analysis and thought the scope should extend to the entire section. Environmental Assessment at 17.

In *Sylvester v. U.S. Army Corps of Engineers,* 884 F.2d 394 (9th Cir.1989), the court upheld the Corps of Engineers' regulations relating to the scope of its analysis. In that case, a developer planned a ski resort and a golf course. The golf course was planned on a meadow which contained pockets of wetlands. The Corps limited its environmental assessment to the wetlands and not the entire resort. The court upheld this limited scope of analysis because the golf course and the resort were not joined to each other like two links of a single chain. The court noted that both the golf course and the resort could exist without the other.

Similarly, in *Wetlands Action Network v. U.S. Army Corps of Engineers,* 222 F.3d 1105 (9th Cir.2000), the court upheld the Corps of Engineers' decision to limit its environmental assessment to the wetland portion of a major development. The court noted that the wetland portion of the proposed development was relatively small and that the project could proceed without the permit. 222 F.3d at 1117. The court acknowledged that deciding whether federal and non-federal activity are sufficiently interrelated to constitute federal action for NEPA purposes is a very fact-specific question. *Id.* at 1116.

■ ·Here, the facts appear to be more like those in *Stewart v. Potts,* 996 F.Supp. 668 (S.D.Tex.1998), than in either *Sylvester* or *Wetlands Action Network.* In *Stewart v. Potts,* the wetlands were not in a separate area, but were "scattered throughout the 200–acre tract." 996 F.Supp. at 682. The court noted that in all of the cases in which the Corps' jurisdictional disclaimers were upheld, the federal portion and the non-federal portion were "physically, functionally, and logically. separable." *Id.* at 682. The court concluded that because of the interdependence, the scope of analysis should have included the entire project. *Id.* at 682–83.

Here, the Corps' Environmental Assessment acknowledges that "a no-action alternative (i.e., no Corps' permit issued) would not allow the site to be developed in a manner that would accomplish the applicant's project purpose." Environmental Assessment at 4, ¶ I E(1).

This case thus differs from both *Sylvester* and *Wetlands* in that the uplands here are not some separate piece of property but instead are interspersed throughout the section surrounded by washes on every side. It would not be practicable to develop the uplands without an impact on the washes, or to fill in the washes without an impact on the uplands. The permit authorizes 66 crossings interspersed throughout the entire section. And, unlike both *Sylvester* and *Wetlands,* the Corps has admitted in its Environmental Assessment that if it did not issue the permit, the site could not be developed in accordance with the project's purpose.

This case, therefore, presents a very substantial question about the application of the Corps' NEPA implementing regulations. Under the relevant regulations, 33 C.F.R. Part 325, Appendix B, Section 7(b), the Corps is considered to have control and responsibility for portions of the project beyond the limits of the Corps' jurisdiction "where the environmental consequences. of the larger project are essentially products of the Corps' permit action." Here, the development of the entire section with 794 houses is directly dependent upon, and the product of, the Corps' permit action. Without a permit to allow for 66 separate and dispersed crossings, the private project could not go forward.

The Corps' scope of analysis under the National Environmental Policy Act, Environmental Assessment at 3 ¶ I(D), raises substantial questions. In subparagraph D(1), the Corps discusses the crossings as though they were "merely a link" in a corridor type project. But the washes run through the property the way lines run through graph paper. This is not just a pipeline or roadway to a private project. Here, the washes and. the land are part and parcel of the same project.

With respect to subparagraph D(2), the Corps limited its review to the area immediately adjacent to the crossings. Yet the location of all of the uplands and all of the washes dictate where construction will be. The project as a whole will dictate the location and configuration of the crossings. *See, e.g.,* the map entitled "Lone Mountain Property Open Space."

With respect to subparagraph D(3), the Corps noted that only 5% of the site, 31.3 acres of the 608 acres, are jurisdictional waters of the United States. That would be far more significant if the 5% were separated from the rest of the site. But that 5% runs through the entire 608 acres the way capillaries run through tissue. It is difficult to deal with tissue without dealing with capillaries and difficult to deal with capillaries without dealing with tissue. So too here.

With respect to subparagraph D(4), the Corps noted that cumulative federal control and responsibility are limited. In one sense this is true. It is private property. In another sense, however, this is private property with strands of public waters running throughout it. Because of its duty to protect the waters of the United States, federal control of this entire section could be extensive.

Under these circumstances, we find and conclude that there are serious questions on the merits in this case, even under the Administrative Procedure Act's deferential arbitrary and capricious standard of review.

All that remains, therefore, is an analysis of the balance of hardships. The hardship that would be caused to the defendant 56th & Lone Mountain, if enjoined, is delay in connection with its real estate development. Thus, if wrongfully restrained, the defendant may suffer financial harm. We see no hardship caused the federal defendants. The hardship that would be caused the plaintiff if the injunction does not issue is the immediate development of the property without an environmental assessment based upon the entire project. An expanded assessment might have a dramatic impact on the nature of the development and its effect on the waters of the United States and the animal and plant life next to them. While we do not need to evaluate the likelihood of success on the merits (the existence of serious questions is adequate), we do note the possibility of irreparable injury. If this desert land is disrupted, it cannot be restored. We note also that some of the possible harm that might be caused a wrongfully restrained defendant can be ameliorated by the posting of security under Rule 65(c). In any event, we conclude that the balance of hardships tips in favor of the party seeking injunctive relief.

### III.

IT IS THEREFORE ORDERED GRANTING plaintiff's motion for preliminary injunction as follows:

1. Army Corps of Engineers permit number 2000–01928–RWF is hereby temporarily suspended.

2. The federal defendants and the defendant 56th & Lone Mountain, their officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them who receive actual notice of this order, are hereby preliminarily enjoined from any activities that are within the scope of Army Corps of Engineer permit number 2000–01928–RWF anywhere in section 16, known as Lone Mountain, in Phoenix, Arizona.

3. Not later than 15 days after the date of this injunction, the plaintiff shall post security under Rule 65(c), Fed.R.Civ.P., by way of bond or cash in the amount of $50,000.00 for the payment of such costs and damages as may be incurred or suffered by the defendants in the event they are ultimately found to have been wrongfully enjoined.

4. In light of the above, the parties are encouraged to expedite the resolution of this action by filing cross-motions for summary judgment. The Corps is encouraged to consider the preparation of a new Environmental Assessment with a scope of analysis under the National Environmental Policy Act as though federal action included the entire project on all of section 16.