**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

SAVE OUR SONORAN, INC., a non-
profit corporation,
             *Plaintiff-Appellee,*

v.

ROBERT B. FLOWERS, Lieutenant
General, in his official capacity as
Commander, U.S. Army Corps of
Engineers; MARK F. SUDOL, in his
official capacity as Chief of the
Regulatory Branch of the U.S.
Army Corps of Engineers, Los
Angeles District,
             *Defendants,*

and

56TH & LONE MOUNTAIN, L.L.C.,
             *Defendant-Appellant.*

No. 02-16156

D.C. No.
CV-02-00761-FJM

Save Our Sonoran, Inc., a non-profit corporation,

*Plaintiff-Appellant,*

v.

Robert B. Flowers, Lieutenant General, in his official capacity as Commander, U.S. Army Corps of Engineers; Mark F. Sudol, in his official capacity as Chief of the Regulatory Branch of the U.S. Army Corps of Engineers, Los Angeles District; 56th and Lone Mountain, L.L.C.,

*Defendants-Appellees.*

No. 02-16263

D.C. No.
CV-02-00761-SRB

Save Our Sonoran, Inc., a non-profit corporation,

*Plaintiff-Appellee,*

v.

Robert B. Flowers, Lieutenant General, in his official capacity as Commander, U.S. Army Corps of Engineers,

*Defendant,*

and

56th & Lone Mountain, L.L.C.,

*Defendant-Appellant.*

No. 02-16355

D.C. No.
CV-02-00761-SRB

ORDER AND
AMENDED
OPINION

Appeal from the United States District Court
for the District of Arizona
Frederick J. Martone, District Judge, Presiding

Argued and Submitted
February 13, 2003—San Francisco, California

Filed April 26, 2004
Amended May 25, 2005

Before: John T. Noonan, Sidney R. Thomas, and
Richard R. Clifton, Circuit Judges.

Opinion by Judge Thomas

## COUNSEL

Norman D. James, Jay L. Shapiro (argued), Fennemore Craig, Phoenix, Arizona, for defendant-appellant/cross-appellee 56th & Lone Mountain, L.L.C.

Myron L. Scott (argued), Tempe, Arizona, for plaintiff-appellee/cross-appellant Save Our Sonoran, Inc.

Vera S. Kornylak, Arizona Center for Law in the Public Interest, Michael P. Senatore, Defenders of Wildlife, for amicus curiae Defenders of Wildlife.

## ORDER

The attached amended opinion is substituted for the original opinion filed by the panel. With the amendments, the panel has voted to deny the petition for rehearing.

The petition for rehearing en banc was circulated to the entire court. No judge of the court called for a vote on the petition for rehearing en banc within the time established to do so.

The petition for rehearing and petition for rehearing en banc are DENIED.

No further petitions for rehearing will be entertained.

# OPINION

THOMAS, Circuit Judge:

In this appeal, we consider the management of the waterways in Arizona's Sonoran desert. This case, of course, inevitably brings to mind the exchange between Claude Rains and Humphrey Bogart in *Casablanca* (Warner Bros. 1942), which aptly distills this dispute to its essence:

> Captain Renault: What in heaven's name brought you to Casablanca?
>
> Rick: My health. I came to Casablanca for the waters.
>
> Captain Renault: The waters? What waters? We're in the desert.
>
> Rick: I was misinformed.

In our case, it was not Rick Blaine, but the United States Army Corps of Engineers that came to the desert for the waters. An aspiring desert developer, 56th & Lone Mountain, L.L.C. ("Lone Mountain"), sought and obtained a Clean Water Act ("CWA") dredge and fill permit from the Corps for the construction of a gated community near Phoenix. The permit was required, and the Corps' jurisdiction invoked, because water courses through the washes and arroyos of the arid development site during periods of heavy rain. The desert washes are considered navigable waters and therefore fall under the jurisdiction of the federal government. *See* 33 C.F.R. § 328.3(a)(3).

At some point, a non-profit environmental organization, Save Our Sonoran ("SOS"), became aware of the project. It was not, shall we say, the beginning of a beautiful friendship. SOS eventually filed this action against the Corps and Lone

Mountain, alleging violations of the National Environmental Policy Act ("NEPA") and the CWA. The district court issued a preliminary injunction suspending development during the pendency of the litigation. *Save Our Sonoran, Inc. v. Flowers*, 227 F. Supp. 2d 1111 (D. Ariz. 2002). Lone Mountain appealed. We affirm.

I

At the center of this controversy is a 608-acre parcel of undeveloped land ("the property"), an alluvial fan containing a significant number of braided washes. The washes constitute approximately 31.3 acres — about 5% of the site. However, as the District Court found, the washes affect the entire property. Though surrounded on all four sides by other development, the property is essentially unimproved and remains undeveloped desert, albeit not in pristine condition. The parcel was previously owned by the State of Arizona, which decided not to retain it for park or other purposes and sold it for development, an action which was itself the subject of litigation. *Foster v. Anable*, 19 P.3d 630 (Ariz. Ct. App. 2001). The property was purchased from the State at a public auction by Lone Mountain's predecessor for $38.5 million.

Lone Mountain developed a plan to construct an upscale gated residential community consisting of 794 single-family homes. According to the plan, over half of the property would be maintained permanently as open space, including "the bulk of the larger washes."

Pursuant to the CWA, 33 U.S.C. § 1344, Lone Mountain applied for a Section 404 permit from the Corps to fill in 7.5 acres of natural waterways that flow through the property. The permit requested allowance of sixty-six projects in the form of combined road and utility crossings, pad fill, as well as utility, remediation, drainage, and flood control measures.

In response to the application, the Corps issued its environmental assessment and a finding of no significant impact. In

reaching this conclusion, the Corps examined only the washes rather than the entire project. Within this limited area, the Corps concluded that the sixty-six dredge and fill projects would not significantly affect the environment, nor would they disturb the habitats of any endangered species. The Corps determined that no environmental impact statement was necessary, and stated its intent to authorize Lone Mountain to build the sixty-six projects.

The Corps invited public comment on the permit, received requests for a public hearing, but declined to hold one. A variety of agencies and private interests responded by written correspondence. The United States Environmental Protection Agency ("EPA") and the United States Fish and Wildlife Service ("FWS") opposed the issuance of the permit and disagreed with the Corps' findings with respect to whether the site was a potentially suitable habitat for the cactus ferruginous pygmy owl, which is listed as an endangered species. The Arizona Game and Fish Department agreed with the Corps' findings. SOS, a nonprofit group of citizens "dedicated to the preservation" of the Sonoran Desert, also made public comments about the proposed project.

The Corps addressed the public comments, reiterated its preliminary findings, and issued the permit to Lone Mountain, subject to a few conditions. SOS sought a temporary restraining order and preliminary injunctive relief against the Corps and Lone Mountain.

The district court granted a temporary restraining order to SOS and, after a hearing, the district court ordered preliminary injunctive relief. The district court concluded that there were serious questions on the merits regarding SOS's contention. The court emphasized that the development of the entire project depended upon the Corps' permit; the court concluded that the project could not go forward without permission from the Corps for the sixty-six separate and dispersed crossings. *Flowers,* 227 F. Supp. 2d at 1114. Though the washes cover

only 5% of the property, the court described that portion as critical to the whole: "But that 5% runs through the entire 608 acres the way capillaries run through tissue. It is difficult to deal with tissue without dealing with capillaries and difficult to deal with capillaries without dealing with tissue. So too here." *Id.* After determining that there were serious questions on the merits, the district court went on to conclude that the balance of hardships tipped in favor of SOS.

After SOS was informed that Lone Mountain was continuing construction on the site, the non-profit requested clarification with respect to the scope of the injunction. After another hearing, the district court made clear that, in light of its previous factual findings, the status quo could be preserved only if Lone Mountain ceased any and all development on the site until a hearing on the merits could be held.

The Corps elected not to appeal the district court's orders. Lone Mountain, however, appealed both orders, and SOS filed a cross-appeal as to the amount of the bond set by the district court.

## II

Lone Mountain contends that SOS lacks standing to bring this action. An organization may bring an action on behalf of its members if: (1) the individual members would have standing to sue; (2) the organization's purpose relates to the interests being vindicated; and (3) the claims asserted do not require the participation of individual members. *Ecological Rights Found. v. Pac. Lumber Co.*, 230 F.3d 1141, 1147 (9th Cir. 2000). The individual members have standing if they can demonstrate that an actual or threatened injury exists, which is fairly traceable to the challenged action, and that such injury is likely to be redressed by a favorable decision. *Id.* "In addition to these constitutional requirements, a plaintiff bringing suit under the Administrative Procedure Act for a violation of NEPA must show that his alleged injury falls within

the 'zone of interests' that NEPA was designed to protect." *Kootenai Tribe of Idaho v. Veneman*, 313 F.3d 1094, 1111-12 (9th Cir. 2002) (internal quotation marks omitted).

Lone Mountain does not dispute that SOS has met the APA requirements or the latter two elements of Article III standing. It contends that SOS failed to establish that any of its individual members would have standing to sue because no member has demonstrated actual injury, causation, or redressability. "The 'injury in fact' requirement in environmental cases is satisfied if an individual adequately shows that she has an aesthetic or recreational interest in a particular place, or animal, or plant species and that that interest is impaired by a defendant's conduct." *Ecological Rights Found.*, 230 F.3d at 1147.

Here, SOS tendered affidavits and presented evidence that its members owned land in close proximity to the property, and that the development would impair their recreational opportunities. *See, e.g., id.* at 1151 (finding plaintiff established injury by averring longstanding recreational and aesthetic interests in place at issue, and that these interests were derogated due to concerns that defendant was discharging pollutants into creek); *Northwest Envtl. Def. Ctr. v. Bonneville Power Admin.*, 117 F.3d 1520, 1528-29 (9th Cir. 1997) (finding cognizable injury to plaintiffs based on affidavits stating enjoyment from fly fishing, sport fishing, and nature watching in river at issue). Once a plaintiff has established an injury in fact, the causation and redressability standards under NEPA are relaxed, such that a private owner's alleged noncompliance with NEPA is sufficient to meet these standing requirements. *See Cantrell v. City of Long Beach,* 241 F.3d 674, 682 (9th Cir. 2001) ("[W]e have held that to establish redressability plaintiffs asserting procedural standing need not demonstrate that the ultimate outcome following proper procedures will benefit them.").

**[1]** The fact that this development is private does not destroy standing. *See, e.g., id.* at 680-81 (rejecting Navy's

argument that plaintiffs can only assert standing with respect to property to which they possess a legal right of access, and stating that "because [the plaintiffs] desire to view the birds at the Naval Station from publically accessible locations outside the station [there] is an interest sufficient to confer standing"). Indeed, one of Lone Mountains' purported objectives in its development is to preserve wildlife-viewing opportunities, both for its residents and others from publicly accessible locations. Given the members' adjacent land ownership, the development's alleged impact on wildlife in the area, and the alleged diminution of the members' recreational access and use, SOS has established sufficient standing to maintain this action.

## III

### A

As we observed in *Clear Channel Outdoor, Inc. v. City of Los Angeles*, "[t]he standard for granting a preliminary injunction balances the plaintiff's likelihood of success against the relative hardship to the parties." 340 F.3d 810, 813 (9th Cir. 2003). We have described two sets of criteria for preliminary injunctive relief. Under the "traditional" criteria, a plaintiff must show "(1) a strong likelihood of success on the merits, (2) the possibility of irreparable injury to plaintiff if preliminary relief is not granted, (3) a balance of hardships favoring the plaintiff, and (4) advancement of the public interest (in certain cases)." *Johnson v. Cal. State Bd. of Accountancy*, 72 F.3d 1427, 1430 (9th Cir. 1995). Alternatively, a court may grant the injunction if the plaintiff "demonstrates *either* a combination of probable success on the merits and the possibility of irreparable injury *or* that serious questions are raised and the balance of hardships tips sharply in his favor." *Id.* (internal quotation marks omitted).

As we have said many times regarding the two alternative formulations of the preliminary injunction test: "These two

formulations represent two points on a sliding scale in which the required degree of irreparable harm increases as the probability of success decreases. They are not separate tests but rather outer reaches of a single continuum. *Baby Tam & Co. v. City of Las Vegas*, 154 F.3d 1097, 1100 (9th Cir. 1998) (internal quotation marks and citations omitted).

A district court's order with respect to preliminary injunctive relief is subject to limited review and will be reversed only if the district court "abused its discretion or based its decision on an erroneous legal standard or on clearly erroneous findings of fact." *United States v. Peninsula Communications, Inc.*, 287 F.3d 832, 839 (9th Cir. 2002). Our review may be de novo under circumstances in which the district court's ruling rests solely on a premise of law and the facts are either established or undisputed. *A&M Records, Inc. v. Napster, Inc.*, 284 F.3d 1091, 1096 (9th Cir. 2002). However, here, the district court's order was grounded in its factual findings.

Mere disagreement with the district court's conclusions is not sufficient reason for us to reverse the district court's decision regarding a preliminary injunction. *Sports Form, Inc. v. United Press Int'l, Inc.*, 686 F.2d 750, 752 (9th Cir. 1982) ("[U]nless the district court's decision relies on erroneous legal premises, it will not be reversed simply because the appellate court would have arrived at a different result if it had applied the law to the facts of the case. Rather, the appellate court will reverse only if the district court abused its discretion.").

Under our deferential standard of review, we conclude that the district court did not abuse its discretion in granting the preliminary injunction. There are no clearly erroneous factual findings made by the district court, and the district court did not apply an incorrect legal standard. Rather, the district court made the determinations of hardships based on its factual findings and balanced the hardships appropriately in conclud-

ing that the issuance of a preliminary injunction was warranted.

B

**[2]** The district court correctly held that the Corps had improperly constrained its NEPA analysis to the washes, rather than considering the development's effect on the environment as a whole. NEPA requires federal agencies to prepare an environment impact statement for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). A section 404 permit issued by the Corps is a "Federal action" to which NEPA applies. *Tillamook County v. U.S. Army Corps of Eng'rs*, 288 F.3d 1140, 1142 (9th Cir. 2002). The Corps must determine the potential impact that a proposed development would have on the jurisdictional waters, and on "those portions of the entire project over which the district engineer has sufficient control and responsibility to warrant Federal review." 33 C.F.R. Pt. 325, App. B § 7(b)(1). The Corps has "control and responsibility" for portions of the project in which "the Federal involvement is sufficient to turn an essentially private action into a Federal action. These are cases where the environmental consequences of the larger project are essentially the products of the Corps permit action." *Id.* § 7(b)(2). The typical factors to consider in order to determine the circumstances under which the potential environmental consequences on non-jurisdictional land are such that the Corps has control and responsibility are:

> (i) Whether or not the regulated activity comprises "merely a link" in a corridor type project (e.g., a transportation or utility transmission project).

> (ii) Whether there are aspects of the upland facility in the immediate vicinity of the regulated activity which affect the location and configuration of the regulated activity.

(iii) The extent to which the entire project will be within Corps jurisdiction.

(iv) The extent of cumulative Federal control and responsibility.

*Id.; see also Sylvester v. U.S. Army Corps of Eng'rs*, 884 F.2d 394, 398-99 (9th Cir. 1989).

[3] Although the Corps' permitting authority is limited to those aspects of a development that directly affect jurisdictional waters, it has responsibility under NEPA to analyze all of the environmental consequences of a project. Put another way, while it is the development's impact on jurisdictional waters that determines the scope of the Corps' permitting authority, it is the impact of the permit on the environment at large that determines the Corps' NEPA responsibility. The Corps' responsibility under NEPA to consider the environmental consequences of a permit extends even to environmental effects with no impact on jurisdictional waters at all.

[4] An examination of the record leads us to conclude that the district court did not abuse its discretion in determining there were serious questions as to whether the Corps had correctly confined its analysis. *Flowers,* 227 F. Supp. 2d at 1115. It is significant at the onset to recall that two federal agencies, the EPA and the FWS — not the usual suspects in opposing the action of a federal agency — disagreed with the acreage limitations set forth in the permit applications and thus with the Corps' interpretation of its NEPA responsibility. It is also of importance to our conclusion regarding the Corps' NEPA responsibility that the Corps concluded that the "no action" alternative — denying the permit — would have the effect of halting the project.

[5] The district court made key factual findings that support its conclusion that the Corps violated NEPA by failing to conduct an appropriately broad NEPA analysis. First, the district

court found, and it is undisputed, that the sixty-six permit sites are scattered throughout the entire property. The district court determined that the desert washes "run through the property like lines run through graph paper," *Flowers,* 227 F. Supp. 2d at 1114. The district court determined that the construction is "dictated" by the interconnectedness of the land and washes. *Id.* at 1114. The district court noted that the Corps' own environmental assessment bolstered this conclusion because the Corps concluded that denial of a permit would prevent the site from developing in a manner consistent with the developer's purpose. In short, the entire development was affected by the decisions concerning the washes, and the district court correctly determined that the Corps improperly constrained its NEPA analysis. Because the jurisdictional waters run throughout the property like capillaries through tissue, any development the Corps permits would have an effect on the whole property. The NEPA analysis should have included the entire property.

The Supreme Court's recent decision in *DOT v. Public Citizen*, 541 U.S. 752, 124 S. Ct. 2204 (2004), is not to the contrary. In *Public Citizen*, the Supreme Court excluded from the scope of NEPA analysis any environmental effect that does not have a "reasonably close causal relationship" to the proposed development. 541 U.S. 752, 124 S. Ct. 2204, 2215 (internal quotation marks omitted). Here, the district court found that any development permitted by the Corps would affect the entire property. *Public Citizen*'s causal nexus requirement is satisfied.

For these reasons, the district court also properly rejected Lone Mountain's contention it could confine the Corps' NEPA review by submitting sixty-six different permit sites. In essence, Lone Mountain's argument is that it can constrain the Corps' responsibility under NEPA by submitting a gerrymandered series of permit applications. However, the scope of the Corps' responsibility under NEPA is not dictated by the applicant; rather, it is directed by statute. As we have discussed,

Lone Mountain's narrow interpretation of the Corp's responsibility is contrary to the NEPA compliance regulation.

[6] In sum, given the factual findings made by the district court, we see no abuse of discretion in the district court's conclusion that the Corps had improperly constrained its NEPA analysis.

C

The district court's conclusion that the Corps had improperly confined its NEPA analysis does not end our analysis as to the propriety of the preliminary injunction. The authority to enjoin development extends only so far as the Corps' permitting authority. Although the Corps' improperly constrained analysis violated NEPA, the district court could only enjoin the developer from acts that required a Corps permit. In this case, the district court found the washes subject to federal jurisdiction could not be segregated from private lands; the district court had the power to enjoin the entire project.

[7] Under the facts as found by the district court, and based on the CWA's mandate to regulate the flow of pollutant's into navigable waters, the Corps' permitting authority extends to the entire development proposed by Lone Mountain. Specifically, the CWA is a comprehensive statute, designed to "restore and maintain the chemical, physical, and biological integrity of the Nation's Waters," 33 U.S.C. § 1251(a). The CWA prohibits the discharge of any pollutant, including dredged or fill material, into navigable waters unless authorized by a CWA permit. *Id.* § 1311(a). The desert washes are considered navigable waters and therefore fall under the jurisdiction of the federal government. *See* 33 C.F.R. § 328.3(a)(3). As a result, development impacting the washes requires permission from the Corps by way of a CWA Section 404 permit pursuant to 33 U.S.C. § 1344. The scope of the Corps' permit granting authority is driven by the development's impact on jurisdictional waters.

Because the district court found that any development by Lone Mountain would impact jurisdictional waters, the whole of the property falls under the Corps' permitting authority and the court's authority to enjoin development. The district court grounded its conclusion regarding the Corps' broad permitting authority over the project on the unique geographic features of this property. Specifically, the district court determined that the desert washes "run through the property like lines run through graph paper," *Flowers,* 227 F. Supp. 2d at 1114, and that the washes are "a dominant feature of the land and [that] no development of the property could occur without affecting the washes," *id.* at 1113.

Based on these findings, the district court correctly concluded that the instant facts are analogous to those set forth in *Stewart v. Potts*, 996 F. Supp. 668 (S.D. Tex. 1998). The wetlands in *Stewart* comprised approximately 1% of the total acreage, but were scattered throughout the property. *Id.* at 673. There were approximately 720 pockets of wetlands that ranged in size from "a couple of feet in diameter to less than one-quarter of an acre each." *Id.* at 673; *see also id.* at 683 n.15. The wetlands were scattered underneath a forested area, and the Corps originally determined that it did not have jurisdiction over the trees. *Id.* at 673. The district court reversed, finding that the Corps limited its analysis without a rational or legally sound basis. *Id.* at 682-83. The district court concluded that the Corps had jurisdiction over the wooded area because the pockets of wetlands were immediately adjacent to, underneath, and surrounding the trees. The construction of the golf course that involved the filling of wetlands therefore could not be considered a separate and distinct project from the plans to fell the trees. *Id.* at 683. The "tasks necessary to accomplish [the development of the proposed golf course] are so interrelated and functionally interdependent as to bring the entire project within the jurisdiction of the Corps, and therefore under the mandate of NEPA." *Id. Stewart* determined that the Corps erred by not considering the environmental

impact that the proposed golf course would have on the wooded area.

Because of the interconnected nature of the washes and the surrounding area, the district court found the facts at issue in this case distinguishable from those found in *Wetland Actions Network v. U.S. Army Corps of Engineers*, 222 F.3d 1105 (9th Cir. 2000). In *Wetland Actions*, we upheld the limitation of the scope of the Corps' jurisdiction to the wetland portion of a major development project. *Id.* at 1118-19. We reached this conclusion based on the findings that the direct impact on the wetland portion of the development was a separate and independent phase of the master project, that the wetland portion of the project did not have to be completed for the master plans to continue or to exist, and that, in fact, during the period of the injunction, the master plan continued while the wetland project was stayed. *Id.* at 1110-11, 1117. Here, in contrast, the district court noted that the uplands are not on separate lots, nor are they separable from the navigable waters; rather, the uplands "are interspersed through the section surrounded by washes on every side." *Flowers,* 227 F. Supp. 2d at 1114. Because no development could occur without impacting jurisdictional waters, the whole property can be covered by the injunction.

[8] In sum, because the uplands are inseparable from the washes, the district court was correct to conclude that the Corps' permitting authority, and likewise the court's authority to enjoin development, extended to the entire project. Lone Mountain cannot begin developing any portion of the land in the absence of an appropriately broad NEPA analysis by the Corps. Given all of this, it is clear that the district court did not abuse its discretion in concluding that SOS has raised serious issues that go to the merits of the case. The objections filed by other federal agencies underscore the conclusion that this was not a meritless issue. The district court correctly analyzed controlling law and applied it to the facts.

D

Nor did the district court err in its hardship analysis. The Supreme Court has recognized that "[e]nvironmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.,* irreparable." *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 545 (1987). Here, the district court properly observed that once the desert is disturbed, it can never be restored. Thus, the court concluded, the plaintiffs had adequately demonstrated the possibility of irreparable harm. This reasoning and conclusion are consistent with controlling precedent. *See, e.g., Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 738 n.18 (9th Cir. 2001).

**[9]** Lone Mountain argues that there is no presumption of irreparable harm in procedural violations of environmental statutes. This is doubtless an accurate observation, *see id.*, but it is irrelevant here, because the district court did not apply such a presumption. Rather, the district court carefully concluded that an expanded assessment of the project by the Corps would have a dramatic effect on the nature of the development and, thus, on the surrounding environment. Therefore, the court concluded, proceeding with immediate development of the property without a proper environmental assessment could result in unauthorized development and environmental injury to the jurisdictional waters. In short, the district court conducted a proper analysis of the nexus between the challenged procedure and environmental injury.

Lone Mountain also quarrels with the district court's factual conclusions concerning the nature of the area, but our review of the record indicates that the district court's factual findings are not clearly erroneous. Indeed, one of Lone Mountain's selling points for the development project is the natural beauty of the area. In short, the district court properly applied controlling precedent and conducted a proper analysis in mak-

ing its conclusions regarding the potential for environmental injury to areas under federal jurisdiction.

**[10]** The district court did not abuse its discretion in balancing the hardships. The district court determined that the balance of hardships tipped in SOS's favor because, if wrongfully restrained, Lone Mountain "may suffer financial harm," but if an injunction does not issue, unlawful disruption to the desert is likely irreparable. The district court's analysis is a classic, and quite proper, examination of the relative hardships in an environmental case. Indeed, we have long held that "when environmental injury is 'sufficiently likely, the balance of harms will usually favor the issuance of an injunction to protect the environment.' " *Sierra Club v. U.S. Forest Serv.*, 843 F.2d 1190, 1195 (9th Cir. 1988) (quoting *Amoco*, 480 U.S. at 545).

Lone Mountain argues that the district court erred because the financial hardship it faces from the injunction is concrete and supported by evidence whereas SOS's claims of harm are not. However, a careful examination of the record supports the district court's balancing of the relative hardships. Contrary to Lone Mountain's assertions, the district court did consider the financial evidence presented by Lone Mountain, and it did not abuse its discretion in balancing the hardships.

E

In sum, the district court did not abuse its discretion in its traditional preliminary injunction analysis. Given the factual findings of the court, the Corps improperly limited the scope of its NEPA analysis.

However, we emphasize that our review at this juncture is limited. The grant of a preliminary injunction does not make the grant of permanent injunctive relief inevitable. Nor does it mean that Lone Mountain may not seek a modification of the preliminary injunction. The key district court finding, and

the one that distinguishes this case from *Wetlands Action Network*, is that no portion of the project can go forward without the permit because the washes subject to federal jurisdiction cannot be segregated from private lands. Here, as the Corps itself noted (as opposed to the situation in *Wetlands Action Network*), denying the permit "would not allow the site to be developed in a manner that would accomplish the applicant's project purpose." If Lone Mountain can demonstrate to the district court that a portion of the contested property can be developed without affecting the jurisdictional waters, so that no Section 404 permit would be required, then the preliminary injunction must be modified accordingly. It is the effect on the jurisdictional waters, not on the environment in general, that determines the proper scope of the preliminary injunction. Any injunction must be tailored accordingly.

IV

The district court required SOS to provide a $50,000 security pursuant to Fed. R. Civ. P. 65(c). Both parties contend that the district court abused its discretion in determining such an amount. Lone Mountain claims that the amount is not sufficient; SOS argues that it is too high.

**[11]** As we have observed, a "district court is in a far better position to determine the amount and appropriateness of the security required under Rule 65, and we will review the court's determination only for an abuse of discretion." *Barahona-Gomez v. Reno*, 167 F.3d 1228, 1237 (9th Cir. 1999). "The district court has discretion to dispense with the security requirement, or to request mere nominal security, where requiring security would effectively deny access to judicial review." *Cal. ex rel. Van De Kamp v. Tahoe Reg'l Planning Agency*, 766 F.2d 1319, 1325 (9th Cir. 1985) (finding proper the district court's exercise of discretion in allowing environmental group to proceed without posting a bond), *amended on other grounds,* 775 F.2d 998 (9th Cir.); *Barahona-Gomez*, 167 F.3d at 1237 (determining $1,000

bond in class action not to be an abuse of discretion in light of the showing that "the vast majority of aliens [affected by class action] were very poor").

[12] Here, the district court considered the relative hardships and reached a conclusion as to an appropriate bond amount. Its analysis clearly fell within the latitude of discretion afforded district courts in setting the amount of bond. It is true, as SOS points out, that we have affirmed the district court's approval of nominal bonds in public interest cases. However, each case is fact-specific. So long as a district court does not set such a high bond that it serves to thwart citizen actions, it does not abuse its discretion. *See, e.g., Friends of the Earth, Inc. v. Brinegar*, 518 F.2d 322, 323 (9th Cir. 1975) (reversing the district court's unreasonably high bond of $4,500,000). Here, the district court conducted a hearing. SOS had the opportunity to show that the imposition of anything other than a nominal bond would constitute an undue hardship; however, SOS did not tender such evidence at the hearing. The district court's conclusions were supported by the record.

Lone Mountain contends that the bond amount is too low and that, as a matter of law, district courts are required to set bonds that approximate actual damages, relying on *Sylvester*, 884 F.2d at 397, 401. *Sylvester*, however, does not stand for this proposition. Indeed, we specifically noted in *Sylvester* that "[w]e do not address the appealability of the bonding order because our modification of the injunction requires the district court to reconsider the amount of the bond in any event." *Id.* at 397 n.2. Lone Mountain's authority does not support its proposition. Indeed, the legal proposition urged by Lone Mountain would contradict our long-standing precedent that requiring nominal bonds is perfectly proper in public interest litigation. *See Tahoe Reg'l Planning Agency*, 766 F.2d at 1325.

## V

**[13]** In summary, applying our very deferential standard of review, we conclude that the district court did not abuse its discretion either in granting the preliminary injunction or in setting the bond amount. We affirm the orders of the district court and remand for the remaining proceedings in the case. In reaching this decision, we express no opinion on the ultimate merits of the case, and our decision is without prejudice to Lone Mountain seeking a modification of the preliminary injunction.

**AFFIRMED.**