**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

WHITE TANKS CONCERNED CITIZENS, INC.,

*Plaintiff-Appellant,*

v.

CARL A. STROCK, Lt. Gen. in his official capacity as Commander; UNITED STATES ARMY CORPS OF ENGINEERS; DAVID J. CASTANON, in his official capacity as Chief of the Regulatory Branch of the United States Army Corps of Engineers Los Angeles District,

*Defendants-Appellees,*

10,000 WEST, LLC; PULTE HOME CORPORATION,

*Amicus Curiae.*

No. 07-15659

D.C. No.
CV-06-00703-SRB

OPINION

Appeal from the United States District Court
for the District of Arizona
Susan R. Bolton, District Judge, Presiding

Argued and Submitted
October 21, 2008—San Francisco, California

Filed April 29, 2009

Before: Mary M. Schroeder, Dorothy W. Nelson and
Stephen Reinhardt, Circuit Judges.

Opinion by Judge Schroeder

4993

---

**COUNSEL**

Joy E. Herr, Tucson, Arizona, for the plaintiff-appellant.

Mark Haag, Washington, D.C., for the defendants-appellees.

---

**OPINION**

SCHROEDER, Circuit Judge:

This environmental dispute is between developers who dream of building thousands of homes in the now relatively undisturbed desert near the White Tank Mountains west of Phoenix, Arizona, and a non-profit organization formed essentially to oppose such developments. The focus of this dispute is the adequacy of the study that went into the decision by the Army Corps of Engineers ("Corps") to grant a permit under the Clean Water Act ("CWA") so that the developers could fill several ephemeral washes that run through the project area. The scope of the Corps' jurisdiction under the Clean Water Act is not entirely clear after the Supreme Court's four-four-one decision in *Rapanos v. United States*, 547 U.S. 715 (2006), but there has never been any direct challenge to the exercise of jurisdiction before the Corps in this

case, and the existence of the Corps' jurisdiction is not disputed before this court.

Rather, the dispute before us is over which of our own prior decisions should control. The case boils down to a question of whether it is factually more similar to our court's decision in *Save Our Sonoran v. Flowers*, 408 F.3d 1113 (9th Cir. 2005) ("*SOS*"), or to our decision in *Wetlands Action Network v. U.S. Army Corps of Engineers*, 222 F.3d 1105 (9th Cir. 2000) ("*Wetlands*"). In *SOS*, we held that before the Corps could grant a permit to fill washes similar in nature to those at issue in this appeal, the Corps must consider the entire scope of that development, because the pattern of washes in the area made any development avoiding the washes impossible. *SOS*, 408 F.3d at 1122. In *Wetlands*, we considered a project that required filling natural saltwater wetlands, but in mitigation created a larger freshwater wetland. *Wetlands*, 222 F.3d at 1110-11. We held that the Corps properly confined its environmental review to the wetlands and was not required to study the environmental effects on the upland area, principally because the development of the upland area could proceed independent of the wetlands project. *Id.* at 1116-17.

The district court in this case, in a thoughtful opinion, concluded it should follow *Wetlands* because it agreed with the analysis of the Corps in the district court that the bulk of this project could be developed independently, without affecting the area traversed by the washes. Upon a close review of the district court and administrative records, including the permit application itself and concerns that the Environmental Protection Agency ("EPA") and the Fish and Wildlife Service ("FWS") raised before the Corps, we conclude that the washes here were, in most material respects, more like the washes in *SOS* than those in *Wetlands*. These washes were dispersed throughout the project area in such a way that, as a practical matter, no large-scale development could take place without filling the washes. We therefore hold that the Corps' Finding of No Significant Impact ("FONSI") was made on the

basis of too narrow a scope of analysis, and we reverse the district court.

## I.    Background

In sunnier economic times, the town of Buckeye, located in the western portion of the Phoenix metropolitan area in Maricopa County, envisioned itself growing from a community with a population of 8,500 people to one with about 600,000. This was to be accomplished through the private development of a number of new residential master-planned communities. In preparation for construction of one of these developments, the Corps issued a dredge and fill permit pursuant to the Clean Water Act, 33 U.S.C. § 1344(a). The permit was to be issued to Pulte Home Corporation and 10,000 West, LLC ("the developers") to build what was to be known as "Festival Ranch."

The development was to be located in an undeveloped desert area near the White Tank Mountains and the Hassayampa River floodplain, and was to house an estimated 60,000 people. The site occupies 10,105 acres traversed by approximately 787 acres of washes. 643 acres of these washes are part of the Hassayampa River floodplain and would not be disturbed by the development. The remaining 144 acres of washes are dispersed throughout the development site, and the projected development would fill 26.8 of those acres.

The permit, known as a Section 404 permit, was required because the development would necessitate dredging and filling of desert washes considered to be within the jurisdiction of the Army Corps of Engineers pursuant to the Clean Water Act. *See* 33 U.S.C. § 1344; 33 C.F.R. § 323.1. The Clean Water Act provides that "[t]he Secretary may issue permits, after notice and opportunity for public hearings[,] for the discharge of dredged or fill material into the navigable waters at specified disposal sites." 33 U.S.C. § 1344(a). In turn, the Act defines "navigable waters" as "waters of the United States,

including the territorial seas." *Id.* § 1362(7). A Section 404 permit is a major federal action requiring review under the National Environmental Policy Act ("NEPA"). 42 U.S.C. § 4332(2)(C); *Tillamook County v. U.S. Army Corps of Eng'rs*, 288 F.3d 1140, 1142 (9th Cir. 2002). Because of the need for a Section 404 permit, NEPA required the Corps to investigate whether the dredging and filling would "significantly affect[ ] the quality of the human environment." 42 U.S.C. § 4332(2)(C).

Neither of the parties to this appeal, plaintiff-appellant White Tanks Concerned Citizens, Inc. ("WTCC") and defendants-appellees Army Corps of Engineers, disputes the existence of the Corps' jurisdiction under Section 404 of the Clean Water Act. The district judge observed that the developers, amici curiae in both the district court and here, did question jurisdiction in the district court, but did not raise the concern in a timely manner before the Corps. The district court explained it did not consider the jurisdictional issue because "plaintiff has only challenged the Corps' obligations under NEPA, and no party has asserted claims relating to the court's jurisdictional determination under the CWA." The same is true in this court. Thus no jurisdictional issues that might arise after the Supreme Court's divided opinion in *Rapanos* are before us.

The developers applied for a Section 404 dredge and fill permit on July 1, 2002, so that they could fill in 26.8 acres of washes and ultimately build Festival Ranch. The Corps issued a public notice in October 2003, and received a number of negative comments. Of particular concern to the commenters was the Corps' decision to restrict its scope of environmental analysis to the washes themselves and certain upland areas directly affected by the dredge and fill activity. The EPA and the FWS expressed concern that this permit would have unacceptable environmental impacts that would exceed NEPA's "significance" threshold. Both EPA and FWS urged the Corps to conduct a full-scale environmental analysis, including an

Environmental Impact Statement ("EIS") addressing the large-scale direct, secondary, and cumulative impacts of the project. EPA was also concerned about the potential impacts on the aquatic resources of the area. EPA even indicated that the Corps should conduct a comprehensive EIS covering not only the impacts of Festival Ranch, but also the impacts of many of the other large-scale developments in the Buckeye area, which would together "transform . . . Buckeye from a relatively undeveloped landscape into a large suburban community."

Plaintiff-Appellant WTCC also submitted negative comments. WTCC describes itself as an Arizona non-profit public interest corporation that has been involved in efforts to preserve the White Tank Mountains and surrounding areas since 2000. It urged the Corps both to analyze the impacts from the entire Festival Ranch project and to conduct a full-scale EIS, rather than a shorter Environmental Assessment ("EA") followed by a FONSI.

Despite the negative comments, both governmental and non-governmental, that the Corps received on its restricted scope of analysis, the Corps did not expand its analysis or create an EIS. On July 25, 2005, the Corps instead issued a FONSI after concluding that the issuance of the dredge and fill permit would not cause significant environmental impacts with respect to the areas it considered, i.e., the 787 acres of washes and the 83.6 acres of uplands immediately adjacent to the washes.

WTCC filed this action against the Corps on March 10, 2006, in the United States District Court for the District of Arizona. The developers appeared as amici curiae. The developers challenged WTCC's standing to bring the action. The district court viewed the affidavit of WTCC's director and spokesperson, Kim Beneli, as insufficient for showing injury in fact. The court nonetheless fully addressed the merits of

WTCC's claims and ultimately granted summary judgment for the Corps on the merits.

Standing is also an issue on appeal, and we reject the developers' contention that WTCC's affidavit is insufficient to establish standing. We address WTCC's principle contention on the merits that the district court erred in upholding the Corps' narrow scope of environmental analysis. We do not reach WTCC's alternative argument that the Army Corps of Engineers should have considered the cumulative effects of Festival Ranch along with all of the other developments contemplated under the town of Buckeye's optimistic growth plan. Such effects are, at this time, even more speculative than they may have seemed at the time of the Corps' permit decision. We conclude that the Corps unreasonably narrowed its scope of analysis and remand to the district court to enter an injunction against the issuance of the Section 404 permit until the requisite environmental analysis is accomplished in accordance with this opinion.

## II.   Analysis

### A.   Standing

WTCC's problem with standing stems from the affidavit submitted in the district court by its director, Kim Beneli. The affidavit explains the purpose and history of the organization, but does not spell out the interests that Beneli personally had in the area to be developed as Festival Ranch. Instead, the affidavit states that members of WTCC regularly use the area, planned as Festival Ranch, for recreational purposes.

The dispute hinges primarily on whether WTCC, through this affidavit, has sufficiently alleged an injury in fact and, therefore, established standing to sue. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-62 (1992) (setting forth the "irreducible constitutional minimum of standing," which includes injury). An organization has standing to sue on

behalf of its members if: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purposes; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Ecological Rights Found. v. Pac. Lumber Co.*, 230 F.3d 1141, 1147 (9th Cir. 2000) (quoting *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977)). Some of the individual members of WTCC, therefore, must demonstrate that they will suffer an injury as a result of the Corps' action in issuing a Section 404 permit. No one appears to contend that if these members of WTCC can establish injury, WTCC nevertheless lacks standing for some other reason.

[1] In environmental cases, the requisite injury for standing purposes is not necessarily injury to the environment, but injury to the plaintiff. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 182 (2000). That injury element is satisfied if the plaintiff has an aesthetic or recreational interest in the particular place and that interest will be impaired by the defendant's conduct. *Ecological Rights Found.*, 230 F.3d at 1147; *see also Laidlaw*, 528 U.S. at 183.

> Under *Laidlaw*, then, an individual can establish 'injury in fact' by showing a connection to the area of concern sufficient to make credible the contention that the person's future life will be less enjoyable — that he or she really has or will suffer in his or her degree of aesthetic or recreational satisfaction — if the area in question remains or becomes environmentally degraded.

*Ecological Rights Found.*, 230 F.3d at 1149.

[2] The Beneli affidavit states that most of WTCC's members live near the area that is to become Festival Ranch and that several of its members use that area for "hiking, horse-

back riding[,] and other activities." The description of the organization's purpose tells us that the members of WTCC must have recreational and aesthetic interests in preserving the undeveloped nature of the area in question, and those interests are served by membership in WTCC. This is the very sort of "tangible, continuing connection to . . . [the] particular location" that is required for standing. *Id.* at 1148. The WTCC has properly alleged that its members "use the affected area and are persons for whom the aesthetic and recreational values of the area will be lessened by the challenged activity." *Laidlaw*, 528 U.S. at 183 (internal quotation marks and citations omitted).

A closely analogous decision of our court is *Ecological Rights Foundation*, which also involved organizational standing through the affidavits of members. The district court there determined that the plaintiff organizations lacked standing because the affidavits did not specifically state that the members lived near and regularly used the affected area. 230 F.3d at 1149. We reversed, holding there was standing, focusing on the statements of two members of the organizations who alleged that they had used the affected area in the past and that they would like to continue using the area in the future. *Id.* at 1150.

**[3]** In this case, the district court, in denying standing, looked only to the technical failure of the Beneli affidavit to allege that she herself used the desert that is to become Festival Ranch. According to her affidavit, however, members of the organization do regularly use that area for recreational and aesthetic purposes and want to continue to do so. If Festival Ranch is built, the members will no longer be able to enjoy such activities as hiking and horseback riding because the area will no longer be relatively undisturbed desert. It will instead be a master-planned community with houses, roads, and other infrastructure. The affidavit also states that several members of WTCC live near what is to become Festival Ranch. Because all these WTCC members would have stand-

ing to sue, WTCC does too because the suit is germane to the organization's purpose and the requested relief — in this case injunctive — does not require individual participation. *Id.* at 1147. WTCC has shown that the development of Festival Ranch "threatens imminent and concrete harm to the interests of [its] members." *Summers v. Earth Island Inst.*, ___ U.S. ___, 129 S. Ct. 1142, 1150 (2009).

## B. Scope of the Corps' Environmental Analysis

**[4]** It is important, at the outset, to understand the difference between the jurisdiction of the Corps under the CWA, which is limited to "waters of the United States," and the scope of analysis required in an environmental evaluation under NEPA. *See, e.g.*, *SOS*, 408 F.3d at 1122. The ephemeral washes that give rise to the jurisdiction of the Corps to consider whether to issue a permit under the CWA represent a very small number of acres in a very large development. The scope of the environmental review under NEPA, however, must be dictated by the environmental effects triggered by the filling of those washes. As expressed in the regulations themselves, the scope of analysis may be expanded well beyond the waters that provide the initial jurisdictional trigger. The Corps' scope of analysis must

> address the impacts of the specific activity requiring a [Corps] permit and those portions of the entire project over which the district engineer has sufficient control and responsibility to warrant federal review. . . . Federal control and responsibility will include the portions of the project beyond the limits of Corps jurisdiction where the cumulative Federal involvement of the Corps and other Federal agencies is sufficient to grant legal control over such additional portions of the project.

33 C.F.R. Pt. 325 App. B §§ 7(b)(1), 7(b)(2)(A).

**[5]** We held in *SOS* that where a development could not go forward without a permit, then the Federal involvement was sufficient to grant "Federal control and responsibility" over the project within the meaning of the regulation. 408 F.3d at 1121-24. The United States Supreme Court's decision in *Public Citizen* is not to the contrary. In that case, the Supreme Court held that an agency did not have to take into account certain environmental effects in its EA because that agency had "no ability to countermand the President's lifting of the moratorium" on trucks from Mexico; therefore, it was not the agency's action that was the proximate cause of the negative environmental impacts. *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 766-67 (2004). In *SOS*, this court determined that it was the Corps' issuance of the Section 404 permit that allowed the development to occur, and it was the issuance of the permit itself that caused the environmental effects. *SOS*, 408 F.3d at 1124.

**[6]** The number of factual scenarios possible are infinite, but the parties, and the district court, all appear to agree that our decisions in *Wetlands* and *SOS* represent two ends of the spectrum. At one end, the jurisdictional waters are concentrated in certain areas, making it easy to build around them, so that substantial development can go forward without a Section 404 permit. In these cases, the Corps' analysis may be limited to the effect on the waters. *Wetlands* is closer to this end of the spectrum. At the other end of the spectrum, the waters are dispersed throughout the site, so that any construction on the site would be impossible without affecting the waters, and a Section 404 permit would be required for any building. In these cases, the Corps' analysis must include the effects of the entire development. This is the end of the spectrum that *SOS* illustrates.

Thus, in *Wetlands*, this court upheld the Corps' narrow scope of analysis, which was limited to the impacts of activities covered by the permit rather than the impacts associated with the entire development project. 222 F.3d at 1110, 1113.

This court reasoned that a major portion of the development project could proceed without any federal Section 404 permit and that the development would result in no net loss of wetlands, due to mitigation efforts by the developer. Moreover, this court reasoned that the filling of the wetlands was not sufficiently related to the rest of the development. *Id.* at 1110-11, 1117. We later described *Wetlands* in just this way:

> [T]he wetland portion of the development was a separate and independent phase of the master project, that the wetland portion of the project did not have to be completed for the master plans to continue or to exist, and that, in fact, during the period of the injunction, the master plan continued while the wetland project was stayed.

*SOS*, 408 F.3d at 1124 (citing *Wetlands*, 222 F.3d at 1110-11, 1117).

In *SOS*, this court upheld a district court's preliminary injunction that prohibited development unless the Corps conducted a more expanded scope of analysis. The waters in that case were not concentrated in particular areas, as they were in *Wetlands*, but were instead dispersed throughout the development property to such an extent the court said that the "washes affect the entire property." *SOS*, 408 F.3d at 1118. Because the waters were so diffused, "like capillaries through tissue," no development could proceed without filling the waters. *Id.* at 1122. This court concluded that "[t]he NEPA analysis should have included the entire property." *Id.*

The Corps, and the district court, viewed this case as closer to *Wetlands* because they both found that most of the area of the Festival Ranch site could be developed without filling in the ephemeral washes. The Corps and the district court thus assumed that a viable large-scale development could proceed apart from the lands containing the washes. In the parlance of NEPA, there was a feasible "no-action alternative" because

no federal action, i.e., the issuance of a permit, would be required for some large-scale development to proceed.

This is not an accurate description of the situation as reflected in the administrative record, however. The developers' own application for a Section 404 permit admits that a "no-action alternative" was not feasible, because the result would not be a cohesive master-planned community. The result would be isolated clusters of development, which would not be connected to each other. This is because the washes that would have to be filled are not all confined to particular portions of the development site. As the developers' application described it, without the fill permit, there would not be a single community, which is the intent of Festival Ranch, but instead, different "pods" with "restricted access and limited connectivity." The developers also conceded that a denial of a permit would "force abandonment of the Festival Ranch Master Plan." In a June 2005 letter to the Corps, the EPA pointed out that the developers admitted that they "cannot build a master-planned community of at least 3,000 acres within the confines of a 10,105-acre project area without filling 26.8 acres of waters of the U.S." Accordingly, the developers did need the Section 404 permit. There was no feasible "no-action alternative."

[7] In contending an EIS was nevertheless not required, the developers, and the district court, have stressed the relatively tiny percentage of acreage of the overall project that would have to be filled in, and appear to suggest that any percentage of acreage less than the 5% at issue in *SOS* would be insufficient to trigger an expanded scope of analysis. This fundamentally contravenes the reasoning of *SOS*, and of *Wetlands* for that matter. Those cases emphasized the relationship between the jurisdictional waters and the projects for which the dredge and fill permits were sought. It is not the quantity of the water that matters, but the fact that the waters will be affected, and further, whether the waters must be affected to fulfill the project's goals. In fact, the washes at issue in *SOS*

were so small that the district court described them as "capillaries" and as "lines run[ning] through graph paper." *SOS*, 408 F.3d at 1122, 1123. Admittedly, waters at issue in *Wetlands* constituted only 2.6% of the site, less than the 5% in *SOS*. This court upheld the Corps' limited scope of analysis, however, not because of the small percentage, but because "the project certainly *could* proceed without the permit and, as the Corps notes, is currently proceeding without the permit." *Wetlands*, 222 F.3d at 1117 (emphasis in original). Here, the developers themselves have told the Corps that, without the permit, the project as they conceive it, could not proceed.

During the administrative proceedings in this case, other federal agencies expressed concerns about the Corps' limited scope of analysis, asking the Corps to conduct a fuller EA or even an EIS. The same was true in *SOS* where we observed that when other federal agencies suggest to the Corps that the Corps has inappropriately failed fully to consider the effects of a project, this court is more likely to find that the Corps has acted in an arbitrary and capricious manner. *SOS*, 408 F.3d at 1122 ("It is significant at the onset to recall that two federal agencies, the EPA and the FWS — not the usual suspects in opposing the action of a federal agency — disagreed with the acreage limitations set forth in the permit applications and thus with the Corps' interpretation of its NEPA responsibility."). Moreover, in *Wetlands*, where this court held that the Corps' limited scope of analysis was proper, EPA and FWS, during the administrative proceedings, withdrew their objections. *Wetlands*, 222 F.3d at 1112. In this case, as in *SOS*, both the EPA and FWS disagreed with the Corps' narrow scope of analysis, and continued to disagree throughout the administrative NEPA review.

**[8]** Because this project's viability is founded on the Corps' issuance of a Section 404 permit, the entire project is within the Corps' purview. *SOS* makes this clear. 408 F.3d at 1124. In *SOS*, we affirmed an injunction barring any development pending adequate environmental review. We did so

"[b]ecause no development could occur without impacting jurisdictional waters." *Id.* The same is true here.

**[9]** The judgment of the district court is **REVERSED** and the matter **REMANDED** for entry of an appropriate injunction against the issuance of a Section 404 permit until the Corps performs the requisite environmental analysis in accordance with this opinion.

**REVERSED and REMANED.**